**AMAX, INC., Plaintiff–Appellant,**

v.

**COLORADO WATER QUALITY CONTROL COMMISSION; City of Westminster; City of Arvada; the Boulder Flycasters Chapter of Trout Unlimited, Defendants–Appellees.**

**ADOLPH COORS COMPANY and City of Golden, Plaintiffs–Appellants,**

v.

**COLORADO WATER QUALITY CONTROL COMMISSION and Colorado Water Quality Control Division; City of Westminster; City of Northglenn; City of Arvada; City of Thornton; the Boulder Flycasters Chapter of Trout Unlimited, Defendants–Appellees.**

Nos. 86CA1008, 86CA1012.

Colorado Court of Appeals,
Div. II.

Dec. 21, 1989.

As Modified on Denial of Rehearing
March 29, 1990.

Vranesh & Raisch, Jerry W. Raisch and Eugene J. Riordan, Boulder, and Western Area Law Dept., Richard O. Austermann, Golden, for plaintiff-appellant Amax, Inc.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., and Jerry W. Goad and Marilyn S. Chappell, Asst. Atty. Gen., Denver, for defendants-appellees Colorado Water Quality Control Com'n and Colorado Water Quality Control Div.

Carlson, Hammond & Paddock, Mary Mead Hammond and M. Wray Witten, Denver, for defendant-appellee City of Westminster.

Thomas D. Lustig, Boulder, for defendant-appellee Boulder Flycasters Chapter of Trout Unlimited.

Saunders, Snyder, Ross & Dickson, P.C., James W. Sanderson, Eugene F. Megyesy, Jr. and Kris Ordelheide, Denver, for plain-

tiffs-appellants Adolph Coors Co. and City of Golden.

Opinion by Judge METZGER.

This appeal is the culmination of several actions initiated by plaintiffs, Amax, Inc., Adolph Coors Co., and the City of Golden, challenging the validity of use classifications and water quality standards adopted by the Colorado Water Quality Control Commission (Commission) for the South Platte River Basin. The district court affirmed the Commission's classifications and standards. On plaintiffs' appeal, we affirm the district court.

The Colorado Water Quality Control Act, § 25-8-102, C.R.S. (1989 Repl.Vol. 11A) (the Act), declares that it is the public policy of this state:

"to conserve state waters and to protect, maintain, and improve, where necessary and reasonable, the quality thereof for public water supplies, for protection and propagation of wildlife and aquatic life, for domestic, agricultural, industrial and recreational uses, and for other beneficial uses, taking into consideration the requirements of such uses; ... [and] to provide for the prevention, abatement, and control of new or existing water pollution...."

To achieve this goal, the Commission is mandated to develop and maintain a comprehensive and effective program for prevention, control, and abatement of water pollution and for water quality protection throughout the entire state. Section 25-8-102, C.R.S. (1989 Repl.Vol. 11A).

In developing this program, initially, the Commission must classify state waters. Section 25-8-202(1)(a), C.R.S. (1989 Repl. Vol. 11A). The method of classification consists of the determination of various beneficial uses, including either the existing uses of water or those that reasonably may be expected to exist in the future. Section 25-8-203, C.R.S. (1989 Repl.Vol. 11A); Department of Health Regulation No. 3.1.0, et seq., 5 Code Colo.Reg. 1002-8.

After the water is classified by use, the Commission must then promulgate water quality standards sufficient to protect those uses. See §§ 25-8-202(1)(b) and 25-8-204, C.R.S. (1989 Repl.Vol. 11A). Water quality standards include numerical limits on the concentration of constituents in water and descriptions of water characteristics which are sufficient to protect the particular use classifications. See § 25-8-204, C.R.S. (1989 Repl.Vol. 11A).

In 1979, the Commission promulgated the Basic Standards Regulations, which created a basin-specific framework for its use classifications and water quality standards. Department of Health Regulation No. 3.1.0, et seq. Thereafter, following an extensive rulemaking proceeding, the Commission adopted the South Platte River Regulation (Regulation), establishing use classifications and water quality standards for the South Platte River Basin. See Department of Health Regulation No. 3.8.0, et seq., 5 Code Colo.Reg. 1002-8. That regulatory scheme is the subject of this litigation.

Plaintiffs participated actively and extensively in the administrative hearings which preceded adoption of the Regulation. They then sought judicial review in several actions, which were later consolidated, in Denver District Court. That court affirmed the Commission's action; this appeal followed.

I.

Standard of Review

Initially, plaintiffs contend that the trial court erred in concluding that the Regulation reflects essentially policy choices, rather than factual determinations, and, consequently, applying a less stringent standard of review. They assert that the record contains insufficient factual support for the Regulation's use classifications and water quality standards and that, therefore, the trial court's order upholding the Regulation must be reversed and the cause remanded to the Commission for further proceedings. We disagree.

In *Citizens for Free Enterprise v. Department of Revenue*, 649 P.2d 1054 (Colo. 1982), our supreme court articulated the reasoning underlying judicial review of ad-

ministrative rulemaking proceedings. Explaining the "based on the record" requirement of § 24-4-106(4), C.R.S. (1988 Repl. Vol. 10A), the state Administrative Procedure Act provision governing administrative rulemaking proceedings, the court held that the standard of review in the consideration of agency rulemaking is reasonableness.

A reviewing court should display sensitivity to the range and nature of determinations that must be made by an administrative agency. Postulating the types of rules promulgated by an agency as lying along a continuum, the court observed that, on one end of this continuum, rules may be based primarily upon policy considerations, with factual determinations playing a tangential role. For such rules, specific factual support should not be required, although the reasoning process that led to the adoption of the rule must be defensible. *Citizens for Free Enterprise v. Department of Revenue, supra; see also* K. Davis, *Administrative Law Treatise* §§ 6:13, 14:28 (2d ed. 1978).

At the opposite end of the continuum, the court noted, the necessity for the rule may turn upon discrete facts capable of demonstrative proof. In that situation, the reasonableness of the agency action depends upon the presence of factual support for its determination. *Citizens for Free Enterprise v. Department of Revenue, supra; see also* K. Davis, *Administrative Law Treatise* §§ 6:13, 14:28 (2d ed. 1978).

Between these two extremes are the numerous agency actions which involve a combination of factual determinations and policy choices. In these instances, the nature and scope of judicial review must be appropriately tailored depending upon which is predominant.

■ Rules adopted pursuant to a statutory rulemaking proceeding are presumed valid. *Regular Route Common Carrier Conference v. Public Utilities Commission,* 761 P.2d 737 (Colo.1988). Accordingly, the burden is upon the challenging party to establish their invalidity by demonstrating that the rulemaking body acted in an unconstitutional manner, exceeded its

statutory authority, or otherwise acted in a manner contrary to statutory requirements. *See Augustin v. Barnes,* 626 P.2d 625 (Colo.1981); § 24-4-106(7), C.R.S. (1988 Repl.Vol. 10A).

■ A reviewing court may not substitute its judgment for that of the administrative agency. And, an agency's construction of its own regulation is entitled to great weight. *Van Pelt v. State Board for Community Colleges & Occupational Education,* 195 Colo. 316, 577 P.2d 765 (1978).

### A.

■ Plaintiffs' argument concerning the predominance of factual determinations in the Regulation rests on two main assertions. First, they contend that, in promulgating the Regulation, the Commission was bound to set use classifications and water quality standards based solely upon existing water uses. Consequently, they argue, to the extent the Regulation is based upon the Commission's assessment of future uses, it is deficient as a matter of law.

We reject this argument for several reasons. First, we note that the enabling legislation, the Act, requires the Commission to prevent, control, and abate water pollution and to protect water quality throughout the state. Section 25-8-202, C.R.S. (1989 Repl.Vol. 11A). This mandates, therefore, that the Commission consider future as well as existing water uses, since it would otherwise be unable to fulfill the purpose of the Act "to maximize the beneficial uses of water." *See* § 25-8-102(1), C.R.S. (1989 Repl.Vol. 11A).

The General Assembly, in expressing a forward-looking statement of purpose, *see* § 25-8-102, and in creating a Commission having broad and extensive powers and duties, *see* §§ 25-8-201 and 25-8-202, C.R.S. (1989 Repl.Vol. 11A), determined that an aggressive and sustained effort is required to protect this vital resource. Thus, we conclude that, here, since the Commission's consideration of future uses was consistent with its statutory mandate, the Regulation is not deficient for that reason.

Second, we are not persuaded that the Commission was restricted to a mere description of existing water uses in the South Platte River Basin when it stated in the purpose clause of the Regulation that: "The classifications identify the actual beneficial uses of the water." Department of Health Regulation No. 3.8.2, 5 Code Colo. Reg. 1002–8. This regulation specifically adopts and incorporates the Basic Standards Regulation, which contains the generic definitional and methodological framework for the classification of all of Colorado's river basins.

In the Basic Standards Regulation, the Commission is directed to employ several considerations in assigning water classifications. In general, these classifications must be directed towards the realization of the water quality goals as set forth in the Clean Water Act, 33 U.S.C. § 1251, et seq., (1977) and the Colorado Water Quality Control Act, § 25–8–101, et seq., C.R.S. (1989 Repl.Vol. 11A). In both instances, the goals of preservation and enhancement of water quality are specifically set out.

Additionally, the Basic Standards Regulation requires that the Commission's classifications protect all current classified and actual uses, Department of Health Regulation No. 3.1.6(1)(d), 5 Code Colo.Reg. 1002–8, and its classifications should be for the highest water quality attainable. Department of Health Regulation No. 3.1.6(1)(e), 5 Code Colo.Reg. 1002–8. The Basic Standards Regulation also provides that waters be classified according to the uses for which they are presently suitable or are intended to become suitable. Department of Health Regulation No. 3.1.13, 5 Code Colo.Reg. 1002–8.

Thus, the statement in the Regulation that "the classifications identify the actual beneficial uses of the water," reflects, of necessity, a policy, rather than a strictly numeric, approach to classification. And, because the Basic Standards Regulation reflects federal and state water quality goals, incorporates both present and intended suitability of use in its overall classifications, and additionally requires that classifications should be for the highest water

quality attainable, we conclude that the term "actual beneficial uses of the water," when viewed in this context, is consistent with the policy-oriented approach required by the Basic Standards Regulation. Consequently, since the Commission's consideration of future uses was consistent with its overall regulatory scheme, it did not err by considering such uses.

### B.

■ Plaintiffs' second argument concerning the predominance of factual determinations in the Regulation is based on the following provision in the Basic Standards Regulation:

"(1) Considerations in Assigning Classifications. The following will serve to guide the Commission in assigning classifications:

. . . .

(e) Classifications should be for the highest water quality attainable. Attainability is to be judged by whether or not the use classification can be attained in approximately twenty (20) years by any recognized control techniques that are environmentally, economically, and socially acceptable as determined by the Commission after public hearings." Department of Health Regulation No. 3.1.6.

Plaintiffs contend that this language obligates the Commission to set classifications and standards based upon future uses or quality of water if and only if the evidence establishes that these future uses or quality of water can be attained in 20 years. Since, they argue, the record contains no evidence or findings concerning attainability, the Regulation is deficient and the trial court erred in ruling otherwise. We do not agree.

The 20–year attainability provision is couched in discretionary rather than mandatory language. And, its placement in the Basic Standards Regulation as the fifth of six "considerations in assigning classifications" obviates any assertion that it is compulsory in nature.

Moreover, the 20–year attainability provision is mandatory in only one section of the Basic Standards Regulation. That section provides that the Commission may downgrade a water use classification, that is, eliminate one or more presently designated uses. However, it must first "be demonstrated that the existing classification is not presently being attained and cannot be attained within a 20–year time period." Department of Health Regulation No. 3.1.-6(2)(b), 5 Code Colo.Reg. 1002–8.

We hold that the 20–year attainability provision does not constitute a mandatory prerequisite to a determination of the validity of the water use classifications of the Regulation. Accordingly, we reject plaintiffs' contentions.

The analysis underlying the Regulation consisting of considerations of stream flow, streambed characteristics, water quality, and concentrations of numerous constituents, abandoned mines and permitted discharges, diversions, and addition of nontributary waters is replete with policy choices designed to achieve the purpose of maintaining and improving the quality of water in the South Platte River Basin. The administrative record contains a staggering amount of data together with extensive, technical testimony concerning the significance and interpretation of this data. Thus, policy decisions, supported by ample data and clearly articulated reasoning, permeate the Regulation.

Inasmuch as the Regulation addresses predominantly policy determinations, judicial review is limited to considerations of reasonableness. The Regulation reflects the Commission's adherence to its statutory mandates and its own regulatory framework. Upon examining the record ourselves, *see Anderson v. Colorado State Department of Personnel*, 756 P.2d 969 (Colo.1988), and deferring to the Commission's expertise, we conclude that the Regulation is reasonable because of the factual support in the record, together with the Commission's clearly articulated, defensible reasoning.

### Scientific Methodology

Plaintiffs contend that several decisions of the Commission in adopting the water quality standards were based upon either insufficient data or an improper application of scientific methodology to existing data. Upon reviewing the record, we conclude that the standards, both generally and specifically, have an appropriate basis.

### A.

### In General

Plaintiffs contend that the scientific methodology employed by the Commission was unreasonable and inappropriate. We find no error.

The Commission set the water quality standards by reviewing data obtained from monitoring stations established at various stream segments, discarding extreme values that were statistical anomalies or "outliers," calculating the mean plus one standard deviation (X + X), and comparing that result to the table values set out in the Basic Standards Regulation. The choice between table value and (X + S) was based upon which was higher, and whether a protected use was already in place. Data for segments containing more than one monitoring point were averaged for that segment. A zero value was used for concentrations below detection limits.

### B.

### Specific Methodologies

### 1.

### (X + S)

Plaintiffs contend that use of the mean plus one standard deviation (X + S) methodology was unreasonable. This contention is based on their assertion that an (X + S) methodology is appropriate only if the data to which it is applied are "normally distributed," that is, that the data will produce a normal or bell-shaped curve symmetric about a mean value upon being graphed. We find no error.

Plaintiffs concede that several models or statistical methodologies could be used to analyze these data. The record contains several proposed statistical methodologies by various parties to the administrative proceedings. The Water Quality Control Division recommended the mean plus one standard deviation methodology $(X + S)$. The Division of Wildlife objected to this recommendation, contending that the addition of a standard deviation could allow erratic data to translate into pollutant levels toxic to aquatic life. Coors proposed setting the standards at the highest recorded in-stream value, and Amax proposed a mean plus two standard deviation $(X + 2S)$ methodology.

■ The existence of these various competing methodologies, with their attendant consequences, demonstrates the policy-making nature of the Commission's task in this regard. An evaluation of acceptable risks was, of necessity, inherent in the Commission's selection of one methodology and its rejection of the others proposed. Consequently, we must determine whether the Commission's decision was a reasonable one.

■ This decision, similar to that in *Industrial Union Department, AFL–CIO v. Hodgson*, 499 F.2d 467 (D.C.Cir.1974), encompassed "in the final analysis an essentially legislative policy judgment, rather than a factual determination, concerning relative risks of under protection as compared with over protection." We must, therefore, defer to the Commission's decision, despite the existence of conflicting evidence. *See Amoco Oil Co. v. Environmental Protection Agency*, 501 F.2d 722 (D.C.Cir.1974).

The record fails to support Coors and Amax's contention that the data here are not normally distributed. The record indicates that it is a standard statistical practice to assume data are normally distributed, and that this assumption was appropriate, given the way the data were obtained. Moreover, since Amax recommended an $(X + 2S)$ methodology, and that methodology also requires that one assume normal data distribution, it is now precluded from con-

testing the Commission's selection of another methodology resting upon the same statistical assumption. Accordingly, we conclude that the Commission's decision was not unreasonable, and it will be upheld.

## 2.

## Outliers

Plaintiffs also contend that the elimination of "outliers" from the data used to compute water quality standards was unreasonable. They admit that outliers should be excluded from the data base, and that there are several methods by which this could be accomplished. Their only objection is to the method the Commission used.

■ The Commission excluded outliers that were attributable to high flows or periods of suspended solids. The Basic Standards Regulation provides that water quality standards may be exceeded during temporary natural conditions such as unusual precipitation patterns, spring runoff, or drought, and such conditions are not reasons for changing the standards. Department of Health Regulation No. 3.1.-7(1)(b), 5 Code Colo.Reg. 1002–8. Accordingly, exclusion of data attributable to high flows is consistent with the Commission's mandate and is, therefore, reasonable. For the same reason, we conclude that excluding an outlier attributable to a period of suspended solids was reasonable.

## 3.

## Chauvenet's Criterion

■ The Commission also excluded outliers based upon a statistical test known as Chauvenet's Criterion. Plaintiff's object to the use of Chauvenet's Criterion because it is to be used only if the data are normally distributed. As we indicated earlier in our evaluation of the appropriate statistical methodology, it is a standard statistical procedure to assume that data are distributed normally; thus, application of Chauvenet's Criterion was proper here. Since the Commission was entitled to use its ex-

pertise in judging the reliability and representative quality of particular data, *United States Steel Corp. v. Train,* 556 F.2d 822 (7th Cir.1977), we will not disturb its decision on review.

### 4.

### Averaging

■ Plaintiffs next argue that incorrect averaging of water quality data created water quality standards that were not representative of water quality in Segment 14 of Lower Clear Creek. Essentially, plaintiffs contend that the absence of water from Segment 14 was inappropriate and rendered the Segment 14 standards unreasonable as based on inaccurate data. We disagree.

The Basic Standards Regulation requires that all classified uses, including downstream uses, must be protected. Department of Health Regulation Nos. 3.1.3, 3.1.-6(1)(c), 3.1.9, and 3.1.10, 5 Code Colo.Reg. 1002–8. The South Platte Regulation contains the same requirement. Department of Health Regulation No. 3.8.8(IV)(2), 5 Code Colo.Reg. 1002–8.

Plaintiffs have failed to point to any specific indications in the record that data obtained from a Segment 15 monitoring station and from another monitoring station "just a short distance above Segment 14," as they characterize it, are unrepresentative of data from Segment 14. Consequently, given the Commission's requirement to protect downstream uses, we conclude that its use of the data from adjoining segments is not so methodologically improper as to render the Commission's use of this data arbitrary · or capricious.

### 5.

### Zero Value

■ Amax contends that the assignment of a value of zero for water quality data showing substance concentration below laboratory detection limits was improper. It contends that this decision ignored the probability that there was some distribution of concentration values between the zero level and the level of detection. Con-

sequently it proposed to the Commission that it "split the difference." We find no error.

■ Initially, we note that the Commission had several options available to it in calculating mean water quality. Its selection of one appropriate methodology over other, arguably appropriate methodologies, does not make its decision arbitrary and capricious. Moreover, the Commission had precedential authority for its decision, since the Regulation's statement of basis and purpose provides that the use of zero value for concentrations below detection limits is used to calculate waste load allocations for discharges. Department of Health Regulation No. 3.8.8(V)(7), 5 Code Colo.Reg. 1002–8.

Additionally, we note that Amax conceded at the hearing that the numerical standard which results from a zero value computation is not significantly different from that obtained by Amax's proposed "split the difference" computation.

Accordingly, the Commission's refusal to "split the difference" was not arbitrary or capricious.

### III.

### Use Classifications

### A.

The Colorado Water Quality Control Act and the Basic Standards Regulation require the Commission to classify state waters based upon "present uses of the water, uses for which it is suitable in its present condition, or the uses for which it is to become suitable as a goal." Section 25–8–203(2)(c), C.R.S. (1989 Repl.Vol. 11A); Department of Health Regulation Nos. 3.1.6 and 3.1.13, 5 Code Colo.Reg. 1002–8. Examples of classified uses include domestic water supply, recreation, agriculture, and aquatic life. Department of Health Regulation No. 3.1.13.

In challenging the use classifications, plaintiffs reassert their two primary challenges to the Commission's action. First, they argue that, since the Commission bound itself to set classifications and stan-

dards only upon existing uses, the water quality classifications, to the extent that they contemplate future uses, are flawed. We have rejected this argument above in Section I, A, based on the statutory and regulatory framework within which the Commission was obligated to perform its task.

Secondly, plaintiffs contend that the use classifications, to the extent they are based upon future uses and quality, are unsupported by the record, because the record fails to provide adequate proof that such future uses or quality are attainable within 20 years. We have rejected that argument above in Section I, B, concluding that the 20–year attainability provision is not mandatory except in downgrading situations, which are not at issue here.

Plaintiffs argue, however, that even if we reject their assertions concerning existing uses or quality and 20–year attainability, the use classifications are, nevertheless, improper because they are unsupported by the evidence. We disagree.

It is important to note that the classifications to which plaintiffs object are those dealing with aquatic life. In general, waters are classified for aquatic life use if they are "suitable or intended to become suitable for the protection and maintenance of aquatic life forms...." Department of Health Regulation No. 3.1.13(1)(c), 5 Code Colo.Reg. 1002–8 (1981). The rationale for the aquatic life classification is contained in Department of Health Regulation No. 3.1.-16, 5 Code Colo.Reg. 1002–8 (1981), the statement of basis and purpose to the Basic Standards Regulation.

Therein, it is noted that the aquatic life classification was defined in terms of habitat. A temperature differentiation was used, which resulted in cold and warm water aquatic life categories under Class 1. Additionally, a differentiation was made to account for waters in which the potential life-forms are presently limited by flow and streambed characteristics rather than by water quality characteristics alone.

This theme was repeated in the Regulation, in which the Commission explained that the use classifications are based upon actual current uses or existing water quality. It notes that, in the latter case, even though the use may not be in place, the classification is attached if existing water quality would allow that use. Department of Health Regulation No. 3.8.8(IV), 5 Code Colo.Reg. 1002–8.

Accordingly, the habitat approach, which includes a consideration of all relevant factors affecting life-forms such as temperature, flow, streambed characteristics, and water quality, pervades the use classification decisions. Since this, of necessity, involves a balancing of risks and benefits, *see Amoco Oil Co. v. Environmental Protection Agency, supra,* it is predominately policy-oriented.

### B.

### Coors and Golden's Use Classification Challenges

### 1.

### Segment 14 Lower Clear Creek.

 Coors and Golden assert that the Commission improperly classified Segment 14 of Lower Clear Creek as Class II Warm Water Aquatic Life. Segment 14 is characterized by intermittent water flow. As a result, during some portions of the year, the streambed is dry. Coors argues that, since aquatic life forms require water, this sporadic absence of water renders the Class II Warm Water Aquatic Life Classification invalid. We disagree.

Class II—Warm and Cold Water Aquatic Life is defined as: "Waters where the potential variety of life-forms is presently limited primarily by flow and streambed characteristics." Department of Health Regulation No. 3.1.13(1)(c)(iii), 5 Code Colo. Reg. 1002–8 (1981).

Recognizing the underlying premise that a determination of use classifications is based upon a habitat analysis, we conclude that the record supports the Commission's conclusion that the limitations on aquatic life in this segment are due primarily to flow and streambed limitations. Coors and Golden concede that "streambed characteristics in Segment 14 lack sufficient charac-

teristics to support aquatic life." However, since the record shows that water is present part of the time, it necessarily follows that a classification of some type is required. Since this classification, by definition, contemplates that flow and streambed characteristics affect habitat, we cannot say that selection of this use classification was arbitrary and capricious.

### 2.

### Segment 15 Lower Clear Creek

■ Coors and Golden next object to the classification of Segment 15 of Lower Clear Creek as Warm Water—Class I Aquatic Life. They argue that this classification is improper because of the absence of a wide variety of warm water aquatic life in that segment, and the absence of any evidence that a wide variety of warm water aquatic life can be present within 20 years. Again, we reject this contention.

Class I—Warm Water Aquatic Life is defined as:

"These waters provide, or could provide, a habitat consisting of water quality levels and other considerations such as flow and streambed characteristics which do or could protect and maintain a wide variety of warm water biota, including sensitive species ... [i]f there are limitations to the potential variety of lifeforms, they are due primarily to uncorrectable water quality conditions...."

Department of Health Regulation No. 3.1.-13(1)(c)(ii), 5 Code Colo.Reg. 1002–8 (1981).

Initially, we reject the contention concerning the applicability of the 20–year attainability provision, since we have already determined that that provision is inapplicable to our considerations here.

As to the lack of a wide variety of biotic life, our review of the record convinces us that the evidence on this point can be best characterized as widely conflicting. The evidence satisfies us that Segment 15 contains sufficient flow and streambed characteristics to support aquatic life, even during dry years.

We will not substitute our judgment for that of the Commission where, as here, there is evidence to support its decision.

*See Citizens for Free Enterprise v. Department of Revenue, supra.*

### C.

### Amax's Use Classification Challenges

■ The Commission classified Segments 2, 4, 5, 6, and 11 of Clear Creek as Class I—Cold Water Aquatic Life. Amax contends that this classification was improper. It argues that these classifications do not reflect existing uses because of the absence of a wide variety of aquatic life in each of these segments. We reject this assertion.

Class I—Cold Water Aquatic Life is defined as:

"These waters provide, or could provide, a habitat consisting of water quality levels and other considerations such as flow and streambed characteristics which do or could protect and maintain a wide variety of cold water biota, including sensitive species.... [i]f there are limitations to the potential of variety lifeforms, they are due primarily to uncorrectable water quality conditions." Department of Health Regulation No. 3.1.-13(1)(c)(i), 5 Code Colo.Reg. 1002–8 (1981).

The record shows, and Amax concedes, that these segments contain, at a minimum, a limited variety of cold water species. Additionally, as Amax further concedes, and as the record shows, existing water quality conditions limit aquatic life in these segments. These water quality conditions are primarily the result of high concentrations of various metals from abandoned mine drainage on tributaries to these segments.

Because the Commission's determination is supported by the record, and because this determination reflects essentially a policy choice, we will not disturb it on review. *Citizens for Free Enterprise v. Department of Revenue, supra.*

### D.

### Temporary Modification Standards: Segment 7
### (Woods Creek) of Clear Creek

■ Amax argues that the temporary modification standards for Segment 7,

Woods Creek, must be set aside because that segment use classification is not goal qualified. Segment 7 is affected by discharge from both active and abandoned mines. It discharges into Segment 5, West Clear Creek. The Commission set the same water quality standards for both segments to protect the downstream use. However, it set temporary modification standards for Segment 7 to reflect the existing higher concentrations caused by the mining discharges.

Contrary to Amax's argument, temporary modification does not require a goal-qualified use classification. The modification may be granted at the time the numeric standard is assigned, if the numeric standard is not being met at present but is necessary for full attainment of the use classification. Department of Health Regulation No. 3.1.7(1)(c). "A temporary modification is preferred over a permanent downgrading of a present classification because, as the Basic Standards Regulation points out, retaining a classification higher than the present usage will serve as a reminder that the conditions are correctable and may increase the priority for funding to attain the classified use." Department of Health Regulation No. 3.1.7(3), 5 Code Colo.Reg. 1002–8.

■■■■■■ The Commission may grant a temporary modification if the standards cannot be met because the current imposition of the necessary controls or corrective measures would result in a substantial and area-wide economic and social impact. The application of this condition requires a judgment by the Commission of what constitutes a substantial and area-wide impact warranting modification. In making this determination, the Commission is guided by water quality standards. *Environmental Protection Agency, supra.*

Such was the case here. The record shows that it might well be technologically not feasible and/or prohibitively expensive to reach the underlying standards for zinc, cadmium, and manganese. Consequently, we conclude that the temporary modification standards for Segment 7 are not invalid.

In summary, we uphold the Commission's action in promulgating the South Platte Regulation. Our analysis of the record, in light of the applicable law and the arguments ably advanced by counsel, convinces us that this regulation constitutes a series of delicate and difficult policy decisions by the Commission. Accordingly, when reviewing the specific contentions of plaintiffs, we have considered whether the record supports the Commission's action by providing an ample factual base, and conclude that it has. In those instances in which the factual base could be arguably less than ample, we are persuaded that the Commission's reasoning for its decision is cogent and defensible under the criteria set out in *Citizens for Free Enterprise v. Department of Revenue, supra.*

The judgment is affirmed.

SMITH and MARQUEZ, JJ., concur.