DIAMOND SHAMROCK REFINING AND MARKETING COMPANY, a Delaware corporation, Plaintiff–Appellee,

v.

COLORADO DEPARTMENT OF LABOR AND EMPLOYMENT and Petroleum Storage Tank Committee, Defendants–Appellants.

No. 96CA1382.

Colorado Court of Appeals,
Div. III.

May 14, 1998.

Rehearing Denied June 11, 1998.

Certiorari Denied April 19, 1999.

Harris Karstaedt Jamison & Powers, A. Peter Gregory, Michael B. Sullivan, Englewood, for Plaintiff–Appellee.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, Bradley W. Cameron, Assistant Attorney General, Denver, for Defendants–Appellants.

Gablehouse & Epel, Timothy R. Gablehouse, Donn L. Calkins, Denver, for Amicus Curiae Colorado Petroleum Marketers Association.

Opinion by Judge JONES.

The primary issue in this case is whether the Colorado Department of Labor and Employment (Department) exceeded or acted contrary to its statutory authority in promulgating regulations which restricted the eligibility of owners of underground petroleum storage tanks to seek reimbursement from the Underground Storage Tank Fund. From a district court judgment invalidating the regulations at issue, the Department appeals, and we reverse.

## I.

The regulations at issue in this case deal with the management and control of underground petroleum storage tanks. Pursuant to these regulations, as authorized by Colo. Sess. Laws 1989, ch. 66, § 25–18–109 at 404 (now repealed), the state of Colorado has established an Underground Storage Tank Fund (Fund) from which owners of underground tanks can seek reimbursement for costs of the cleanup of leakage of petroleum from those underground tanks.

The dispute here arises from the denial of two reimbursement claims of plaintiff, Diamond Shamrock Refining and Marketing Company (Diamond Shamrock), by defendants, the Department and the Petroleum Tank Advisory Committee (Committee), for costs associated with the cleanup of petroleum releases from two underground storage tanks.

In 1991, Diamond Shamrock filed two separate applications for reimbursement from the Fund for expenditures incurred while remediating petroleum contamination at two different sites. Each application for reimbursement was denied on the ground that Diamond Shamrock's claims related to expenditures which did not meet the December 22, 1988, cut-off date of eligibility as established by Department of Labor and Employment 280.80(e) 6 Code Colo. Reg. 1007–5 (Regulation 280.80(e)), and Department of Labor and Employment 280.82(d) 6 Code Colo. Reg. 1007–5 (Regulation 280.82(d)). Interpretation of these regulations is at the heart of this dispute.

Regulation 280.80(e) provides:

Expenses incurred after July 1, 1989, for all releases detected after December 22, 1988 and with remedial actions continuing beyond July 1, 1989, shall be eligible for compensation from the fund providing all other criteria have been met. Applications for reimbursement shall be submitted for approval prior to January 1, 1992. All releases detected prior to December 22, 1988 shall not be eligible for compensation from the fund.

Regulation 280.82(d), in relevant part, provides:

The following types of costs are those which will not be considered allowable costs under this regulation.

. . . .

(15) Any remedial action relating to releases discovered prior to December 22, 1988.

At an administrative hearing on the claims, Diamond Shamrock stipulated in writing that the releases associated with both of its applications were discovered prior to the cut-off date of December 22, 1988. Nonetheless, Diamond Shamrock argued that the cut-off date conflicted with certain statutory provisions and that, consequently, the regulations were void as applied to their requests for reimbursement. The Committee rejected Diamond Shamrock's contention and denied the requests for reimbursement. Subsequently, the Department affirmed the Committee's decision.

Diamond Shamrock then commenced an action for judicial review and declaratory judgment in the district court, arguing again that the Department had exceeded its statutory authority in establishing a cut-off date of eligibility, and that, therefore, the regulations were void as applied to Diamond Shamrock's claims for reimbursement. The district court agreed and remanded the case to the Committee for review of Diamond Shamrock's applications. This appeal followed.

## II.

Diamond Shamrock's primary contention is that the predecessor to the Petroleum Underground Storage Tank Act, § 8–20.5–101, et seq., C.R.S.1997(Act), requires all claims to be reimbursed from the Fund regardless of when the leak was discovered and that, therefore, the Department exceeded its statutory authority in promulgating regulations which establish a cut-off date of eligibility for reimbursement. We disagree with Diamond Shamrock on two grounds.

First, we determine that the Department was acting within its statutory authority in promulgating the regulations which established an eligibility cut-off date for Fund reimbursement. Secondly, we do not agree with Diamond Shamrock that the Act re-

quires reimbursement for all claims for cleanup of leakage.

### A.

■ In determining whether the regulation at issue was promulgated within the authority granted to the Department, we are guided by the principle that administrative regulations are presumed valid and will be set aside only when the challenging party establishes their invalidity beyond a reasonable doubt. *Urbish v. Lamm,* 761 P.2d 756 (Colo.1988).

■ In order to establish the invalidity of regulations, the challenging party must demonstrate that the rulemaking body that promulgated them either exceeded or acted contrary to its statutory authority or, alternatively, that the regulations are unconstitutional. *Amax, Inc. v. Colorado Water Quality Control Commission,* 790 P.2d 879 (Colo. App.1989).

### 1.

We begin with a consideration of the Act's historical context in the federal legislative arena. With this historical background, we can better determine whether the challenged regulations comply with the letter and spirit of the Act, and are consistent with the authority delegated to the Department by the General Assembly. *See Hargett v. Director, Division of Labor,* 854 P.2d 1316 (Colo.App. 1992).

The Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6991–6991I (supp. V 1987) was established in 1976 for the purpose of establishing a national solid waste policy and a regulatory program mandating that hazardous wastes be treated, stored, and disposed of in a manner that will minimize the present and future threat to human health and the environment. *See McCullough, From the Cradle to the Grave: An Historical Perspective of RCRA,* 10 Nat. Resources & Env't 21 (1995).

In 1984, Subtitle I was added to the RCRA specifically to address the widespread environmental problem posed by the leaking of petroleum fuels from underground storage tanks into the groundwater. 42 U.S.C. §§ 6991–6991i (1988). *See* Waddell, *A Practitioner's Guide to the Recently Promulgated UST Regulations,* 41 Ala. L.Rev. 487 (1990). These statutes represent a large and comprehensive regulatory program that was designed with the intent that individual states should implement their own programs using as their model certain national standards.

Under the mandate of Subtitle I, the Environmental Protection Agency (EPA) promulgated regulations requiring owners and operators of underground petroleum storage tanks to maintain evidence of financial responsibility to pay for the cleanup of leaking tanks. *See* 40 C.F.R. § 280.90–280.116 (1988). These regulations, which became effective on January 24, 1989, permitted several methods of accountability for financial responsibility, including insurance, guarantee surety bonds, letters of credit, and set forth criteria for qualification of those who self-insure. *See* 40 C.F.R. § 280.95, § 280.96 (1988).

Analysis reveals that despite the variety of methods available to satisfy EPA financial responsibility regulations, few owners and operators subject to the regulations have the financial resources necessary to meet these requirements. *See* Conniff, *Financial Responsibility Assistance for Underground Storage Tanks: Can Washington Run a Pollution Reinsurance Company?,* 14 U. Puget Sound L.Rev. 1 (1990). A particular obstacle for owners and operators in complying with the federal requirements is unavailability of affordable insurance. *See* General Accounting Office, *Underground Petroleum Tanks: Owner's Ability to Comply with EPA's Financial Responsibility Requirements* 3–4(1990)(summarizing results of a 1990 study revealing that many businesses had difficulty meeting the financial responsibility requirements because insurance was not readily available).

Given the inability, generally, of owners and operators to comply with financial responsibility regulations, many states, including Colorado, enacted their own regulatory programs concerning underground storage tanks. Colorado's program, which is found in the Act, was established in 1989. Colo.

Sess. Laws 1989, ch. 66, §§ 25–18–101 at 397 (later amended, and repealed and reenacted in 1995—*see* Colo. Sess. Laws 1995, ch. 119, at 389).

One of the goals of the Colorado program was to relieve the financial hardship imposed on small businesses when complying with federal financial responsibility requirements. *See* Kelley, *Colorado's New Underground Storage Tank Law,* 19 Colo. Law. 233 (February 1990).

While Colorado's program, like the federal program, required owners to be financially responsible for their underground storage tanks, Colo. Sess. Laws 1989, ch. 66, § 8–20–509 at 390, the financial burden was eased with the establishment of the Fund. Colo. Sess. Laws 1989, ch. 66, § 25–18–109 at 404. The Fund was to be used, in part, for reimbursing tank owners for costs of the cleanup of leakage of petroleum from underground tanks, thereby allowing owners to demonstrate their compliance with the financial responsibility requirements under state and federal law.

The relevant statute, Colo. Sess. Laws 1989, ch. 66, § 8–20–509, stated in pertinent part:

> (1) Each owner or operator of a petroleum underground storage tank shall establish and maintain evidence of financial responsibility for taking corrective action and for compensating third parties for bodily injury and property damage as follows:
>
> . . . .
>
> (d) The fund created in this act, combined with the financial responsibility required by this article, may be used by owners and operators of petroleum underground storage tanks to demonstrate their compliance with any financial responsibility requirements promulgated under state and federal regulations.

Access to the Fund, however, was restricted to those owners who were in compliance with regulations promulgated by the State Inspector of Oils. This requirement, found in Colo. Sess. Laws 1989, ch. 66, § 8–20–509(1)(e), stated:

> Each owner or operator must be in compliance with all regulations pertaining to petroleum underground storage tanks as promulgated by the state inspector of oils pursuant to section 8–20–503 to be eligible to participate in the petroleum underground storage tank fund pursuant to section 25–18–109, C.R.S.

The State Inspector of Oils was charged with promulgating and enforcing regulations which were intended to prevent or minimize the likelihood of leaks from underground storage tanks. Colo. Sess. Laws 1989, ch. 66, § 8–20–503 at 386–87. However, in order to ensure that the state regulations were "no more stringent" than the federal regulations, as mandated by Colo. Sess. Laws 1989, ch. 66 § 8–20–503(1) at 386, the Inspector of Oils could not promulgate such regulations until after the federal regulations were promulgated. The Inspector of Oils, therefore, had to wait until the federal regulations implementing the RCRA underground storage tank financial responsibility program were promulgated in order then to establish the local regulations. The federal regulations were not promulgated until December 22, 1988. 40 C.F.R. § 280.90—280.116 (1988).

2.

■ In light of this history, we conclude that the Department was acting within its statutory authority in establishing a reimbursement eligibility cut-off date of December 22, 1988, for owners and operators of leaking petroleum tanks. Pursuant to the Act, the Department was charged with administering the corrective action and cleanup aspects of the state program. The Act granted the Department broad discretionary power to promulgate rules and regulations in furtherance of its charge.

In Colo. Sess. Laws 1989, ch. 66, § 25–18–105(4) at 402–403, the Department was expressly authorized to:

> (d) Establish procedures, practices, and policies governing any and all aspects of processing, adjusting, defending, or paying claims against the fund which are eligible for payment from the fund. . . .

(e) Establish priorities governing the types of corrective actions which shall be reimbursed from the fund.

In reliance on this broad grant of authority, the Department promulgated Regulation 280.80(e) and Regulation 280.82(d), which restricted eligibility for reimbursement to claims that involved leaks which were discovered after December 22, 1988.

Despite Diamond Shamrock's contention that the Department exceeded its authority in mandating this restriction, we find the restriction to be consistent with the requirements of the Act for eligibility, found in § 8–20–509(1)(e). As noted above, § 8–20–509(1)(e) conditions eligibility for Fund reimbursement on compliance with regulations promulgated by the State Inspector of Oils, after promulgation of federal regulations.

The cut-off date for eligibility in Regulation 280.80(e) and Regulation 280.82(d) is no more stringent than the restrictions set forth in the Act because, before December 22, 1988, it was not possible for owners to satisfy the requirement in § 8–20–509(1)(e). This is because, prior to that date, the Inspector of Oils was unable to promulgate state regulations which were "no more stringent" than the federal regulations which only came into existence on that date. Accordingly, in light of the requirements of compliance set forth in § 8–20–509(1)(e), it was logical for the Department to limit Fund reimbursement eligibility to claims involving leaks discovered after December 22, 1988.

Because the purpose and overall scheme of the Act was to provide general guidance to the Department in adopting an eligibility cut-off date, we find that, in promulgating the challenged regulations, the Department was acting within its authority to "[e]stablish procedures, practices, and policies governing all aspects of processing, adjusting, defining, or paying claims against the fund which are eligible for payment from the fund." Colo. Sess. Laws 1989, ch. 66, § 25–18–105(4) at 402–403. *See Dodge v. Department of Social Services,* 657 P.2d 969 (Colo.App.1982).

### B.

■ Our determination that the Department was authorized to establish an eligibility cut-off date is not inconsistent with the language of Colo. Sess. Laws 1989, ch. 66, § 8–20–509(2) at 390. This conclusion is based on our determination that, contrary to Diamond Shamrock's assertions, this provision does not set forth a general mandate that all claims be reimbursed.

Section 8–20–509(2), pertaining to financial responsibility of owners and operators of petroleum underground storage tanks, provides:

The costs of leak cleanup and third-party liability above ten thousand dollars for leak cleanup and twenty-five thousand dollars for third-party liability per leak occurrence shall be paid out of the underground storage tank fund, which fund is created in section 25–18–109, C.R.S. The maximum amount of the fund's liability shall be one million dollars per occurrence in the aggregate for any and all occurrences which are the responsibility of an individual owner or operator with one hundred or fewer underground storage tanks and two million dollars per occurrence in the aggregate for an owner or operator who has one hundred or more underground storage tanks.

Diamond Shamrock relies on the phrase, "shall be paid out of the underground storage tank fund," to argue that this provision mandates payment of all claims. Thus, because the cut-off date in the regulations, which are themselves consistent with the requirements of § 8–20–509(1)(d), necessarily prevents all claims from being eligible for reimbursement, Diamond Shamrock contends that those regulations contravene the Act and are, therefore, void. We disagree with Diamond Shamrock's contention for several reasons.

First, Diamond Shamrock's contention ignores the integrated statutory scheme of § 8–20–509 and, instead, in interpreting the statute, narrowly focuses on a few words in one subsection of the statute. When the subsection is considered in context, however, it becomes clear that Diamond Shamrock's interpretation is incorrect.

Section 8–20–509 governs financial responsibility for petroleum underground storage tanks. This section has seven sub-parts, of

which the first two are relevant here. The first sub-part sets forth *the financial responsibility* that owners have for corrective action, how owners can satisfy their financial responsibility requirement, what owners must do to be eligible for reimbursement from the Fund, and what activities are ineligible for Fund reimbursement. *See* Colo. Sess. Laws 1989, ch. 66, § 8–20–509(1)(a) through (f) at 390.

The second sub-part, on the other hand, sets forth *the financial requirements* to be met by the owners, including the minimum liability amounts required to trigger fund reimbursement, the maximum amount of fund liability, and procedures for paying claims which are in excess of Fund assets. *See* Colo. Sess. Laws 1989, ch.66, § 8–20–509(2) at 390–391.

Thus, under this scheme, § 8–20–509(1) serves to state the general responsibilities and to define how owners can satisfy these responsibilities through a variety of methods, such as the Fund. Section 8–20–509(1)(e) also defines the eligibility requirements for accessing the Fund.

In contrast, § 8–20–509(2) sets forth the specific requirements to be met in becoming financially responsible. This part of the statute is designed, not to define what claims will be reimbursed, but instead, to set forth financial responsibility requirements that are no less stringent than the federal requirements, as mandated by 42 U.S.C. § 6991c(b)(1)(Supp.V.1987).

This interpretation of the General Assembly's intent is supported by a comparison of § 8–20–509(2) with the federal guidelines provided for meeting this requirement. These guidelines provide:

(a) In order to be considered no less stringent than the federal requirements for financial responsibility for [underground storage tank] systems containing petroleum, the state requirements for financial responsibility for petroleum UST systems must insure that:

(1) Owners and operators have $1 million per occurrence for corrective action and third-party claims in a timely manner to protect human health and the environment;

. . . .

(3) Owners and operators of 1 to 100 petroleum [underground storage tanks] must have an annual aggregate of $1 million; and

(4) Owners and operators of 101 or more petroleum [underground storage tanks] must have an annual aggregate of $2 million.

. . . .

(c) States may allow the use of a wide variety of financial assurance mechanisms to meet this requirement. Each financial mechanism must meet the following criteria in order to be no less stringent than the federal requirements. The mechanism must: Be valid and enforceable. . . .

40 C.F.R. § 281.37 (1988).

Thus, a comparison of the federal guidelines with the statute reveals that the language in § 8–20–509(2) establishing the $1 million and $2 million reserves in financial assurance satisfies the requirements of 40 C.F.R. § 281.37(a)(3) and (4). Furthermore, it is clear that the language in § 8–20–509(2), ensuring that the Fund would be available as a financial responsibility device, satisfies the requirement of 40 C.F.R. § 281.27(c), that the mechanism be valid and enforceable. Therefore, Diamond Shamrock's contention that § 8–20–509(2) mandates reimbursement of all claims must fail when that statute is examined in its entirety and in the light of the clear mandate of § 8–20–509.

In addition, we do not agree with Diamond Shamrock that "the only requirement for eligibility for reimbursement is that an 'occurrence' be present." This suggestion flies directly in the face of the requirements in § 8–20–509(1)(d) and (e), discussed previously, that eligibility for reimbursement is conditioned upon compliance with the regulations promulgated by the State Inspector of Oils.

Despite Diamond Shamrock's assertion that this provision does not indicate at what time an owner must be in compliance, it is a

certainty that one could not be in compliance with this requirement prior to December 22, 1988, because the State Inspector of Oils had not, and could not have, promulgated regulations prior to that time. Construing § 8–20–509(2) as mandating payment of claims regardless of when the leak was discovered would, thus, render § 8–20–509(1)(d) and (e) meaningless and, therefore, we decline to adopt such an interpretation. *See Copeland v. MBNA America Bank,* 907 P.2d 87 (Colo.1995)(statute interpreted so as to give effect to all its provisions and not render any inoperative).

For these reasons, we conclude that the Department was acting within its authority in promulgating Regulation 280–80(c) and Regulation 280–82(d).

### III.

█ In the alternative, Diamond Shamrock contends that the regulations implementing a December 22, 1988, cut-off date constitute a denial of Diamond Shamrock's right of equal protection under the law because the regulations treat owners with leaks discovered prior to the cut-off date differently than it treats owners with leaks discovered after the cut-off date. We are not persuaded.

█ The constitutional guarantee of equal protection of the law assures that those who are similarly situated are afforded similar treatment. *People v. Mozee,* 723 P.2d 117 (Colo.1986).

█ The predicate determination in an equal protection analysis is whether state action has resulted in dissimilar treatment of similarly situated individuals. *Bath v. Colorado Department of Revenue,* 758 P.2d 1381 (Colo.1988). If no such classification has occurred, the equal protection challenge must fail. *People v. Black,* 915 P.2d 1257 (Colo. 1996); *People in Interest of C.G.,* 885 P.2d 355 (Colo.App.1994).

Here, Diamond Shamrock's equal protection challenge fails because similarly situated persons are treated in a similar manner. Every owner and operator in the same position as Diamond Shamrock, namely, those owners and operators whose releases were discovered before December 22, 1988, is denied reimbursement. Therefore, the cut-off date of eligibility does not constitute a denial of equal protection.

Accordingly, the judgment is reversed and the cause is remanded to the district court with directions that it enter judgment in favor of the defendants, affirming the ruling of the Department.

Chief Judge HUME, concurs.

Judge BRIGGS dissents.

Judge BRIGGS, dissenting.

The Department of Labor and Employment (Department) promulgated a regulation that made ineligible for reimbursement from the Underground Storage Tank Fund (Fund) any costs incurred for the cleanup of a petroleum leak discovered before December 22, 1988. In my view, the Department exceeded its statutory authority in making ineligible for reimbursement any costs incurred after the Act became effective, on July 1, 1989. I therefore respectfully dissent.

In 1984 Congress enacted Subtitle I to the Resource Conservation and Recovery Act, 42 U.S.C. § 6691, et seq. (1994). It reflected a growing recognition of the dangers associated with leaking underground petroleum storage tanks. For the first time, tank owners and operators were subject to regulation. Among other things, they were required to maintain evidence of financial responsibility.

The Environmental Protection Agency (EPA) was authorized to adopt implementing regulations. The EPA's regulations became effective December 22, 1988. 40 C.F.R. § 280.1, et seq.

The Colorado General Assembly responded by promulgating the Underground Storage Tank Act (Act). Colo. Sess. Laws 1989, ch. 66, § 8–20–501, et seq.; § 8–20–601, et seq.; § 28–18–101, et seq. It became effective July 1, 1989. *See* Colo. Sess. Laws 1989, ch. 66 at 408.

The Act complied with, and for the most part mirrored, the federal program. As pertinent here, it required each owner or operator of an existing underground storage tank

still in use to register the tank on or before October 1, 1989, and to pay an initial registration fee, followed by payment of an annual fee. *See* Colo. Sess. Laws 1989, ch. 66, § 8–20–506.

Pursuant to Colo. Sess. Laws 1989, ch. 66, § 8–20–507, if a release were detected or suspected, the owner or operator was required immediately to take all actions necessary to stop and mitigate the release. The release also had to be reported to the state inspector of oils within twenty-four hours.

Each owner or operator was required to establish and maintain evidence of financial responsibility for taking corrective action and for compensating third parties for bodily injury and property damages resulting from leaks. However, consistent with the federal program, the General Assembly created the Fund for use in demonstrating financial responsibility. Each owner or operator in compliance with all regulations was eligible to participate in the Fund. *See* Colo. Sess. Laws 1989, ch. 66, § 8–20–509.

Subject to certain limitations, the Fund required payment of the costs per leak "occurrence" above $10,000 for clean-up and above $25,000 for third-party liability. An occurrence was defined as "the entire period of time from the identification through the remediation of any release, leak, or spill of a petroleum product from an underground storage tank or group of associated tanks." Colo. Sess. Laws 1989, ch. 66, § 8–20–509(2).

The state regulations enacted to implement this statutory scheme included Department of Labor and Employment Regulation 280.80(e), 6 Code Colo. Reg. 1007–5, which limited Fund eligibility to those expenses incurred after July 1, 1989, the date the Act became effective. Diamond Shamrock does not challenge Regulation 280.80(e).

The Department also enacted Department of Labor and Employment Regulation 280.82(d), 6 Code Colo. Reg. 1007–5. This regulation further excluded from Fund eligibility the costs of any remedial action, even if incurred after the Act became effective, if the release had been discovered before December 22, 1988. It is this regulation Diamond

Shamrock contends exceeds the Department's statutory authority.

The trial court focused on the requirement in § 8–20–509(2) that the designated costs of leak clean-up and third-party liability "shall" be paid for each leak occurrence. It also focused on the definition of "occurrence," which included "the entire period of time from the identification through the remediation of any release." The trial court then reached what, in my view, was a proper conclusion:

> The costs authorized for reimbursement are clearly set forth in C.R.S. § 8–20–509(2). The Court finds that § 8–20–509(2) is not ambiguous. Accordingly, the Colorado Department of [Labor and Employment] exceeded its statutory authority in promulgating [Regulations 280.80(e) and 280.82(d)]. The 'costs' that 'shall' be paid pursuant to C.R.S. § 8–20–509(2) cannot be limited by regulation to costs for releases detected on or after December 22, 1988.

The Department has authority to regulate, not legislate. *See Adams v. Colorado Department of Social Services*, 824 P.2d 83 (Colo.App.1991). We have a duty to invalidate any administrative regulation that conflicts with the design of a statutory scheme. *See Cartwright v. State Board of Accountancy*, 796 P.2d 51 (Colo.App.1990); *see also Western Colorado Congress v. Colorado Department of Health*, 844 P.2d 1264 (Colo.App. 1992)(court has a duty to set aside any agency action that violates a statutory right).

Initially, I disagree that a party must present proof beyond a reasonable doubt that a statute or rule is unconstitutional. *See United Air Lines v. City and County of Denver*, 973 P.2d 647 (Colo.App.1998)(Briggs, J., specially concurring).

More importantly here, under the federal and state statutory schemes, as well as the federal regulations, the date a leak is discovered is simply not a relevant consideration for any purpose, including Fund eligibility. To the extent any question might exist as to the Department's authority to limit Fund eligibility on such a basis, it is resolved by reference to the expressed purpose of the Act:

The general assembly hereby finds and declares that the leakage of regulated substances from the underground storage tanks constitutes a potential threat to the waters and the environment of the state of Colorado and presents a potential menace to the public health, safety, and welfare of the people of the state of Colorado and to that end, it is the purpose of this part 5 to establish a program for the protection of the environment and of the public health and safety by preventing and mitigating the contamination of the subsurface soil, groundwater, and surface water which may result from leaking underground storage tanks. This part 5 does not include aboveground storage tanks.

Colo. Sess. Laws 1989, ch. 66, § 8–20–501.

Statutes are to be construed to forward their beneficial purpose. *Pace Membership Warehouse v. Axelson,* 938 P.2d 504 (Colo. 1997). To exclude an owner or operator from Fund eligibility merely because the tank leak was discovered before December 22, 1988, or any other date, in no way forwards the Act's beneficial purpose of mitigating contamination. It in fact undermines that purpose.

To achieve the Act's goal, it is critical that owners and operators be *encouraged* to report leaks from existing tanks still in use. They are so encouraged by Fund eligibility.

As a result of the liability created by the Act, exclusion from eligibility *discourages* reporting. This undermines the express statutory duty placed on the state inspector of oils, under Colo. Sess. Laws 1989, ch. 66, § 8–20–503(2)(d) to ensure that "[a]ll releases above reportable quantities are reported to the Colorado department of [Labor and Employment]." Further, no rational reason is apparent under either statutory scheme for excluding from eligibility an owner or operator who discovered a leak on or before December 21, 1988, but was still incurring expenses for clean-up after July 1, 1989. The impact on the environment is the same.

With Regulation § 280.80(e), the Department has limited Fund eligibility to expenses incurred after July 1, 1989, the date the Act became effective. The result is that only those owners and operators who pay fees in compliance with the Act and implementing regulations can share in the Fund. This prevents exhaustion of the Fund by claims for expenses by those not contributing. At the same time, owners and operators of existing tanks are not discouraged from reporting leaks.

In sum, nothing in the federal act, federal regulations, or the state act makes the date a leak is discovered relevant for any purpose, including Fund eligibility. Creating such a criterion undermines the purpose of the Act and is unnecessary to protect the Fund. I therefore respectfully dissent.