GBM COMMUNICATIONS, INC. d/b/a
Access U.S., Plaintiff-Appellee,

v.

UNITED INTER–MOUNTAIN
TELEPHONE COMPANY,
Defendant-Appellant.

Court of Appeals of Tennessee,
Eastern Section.

April 18, 1986.

Permission to Appeal Denied by
Supreme Court Sept. 8, 1986.

James B. Wright, Ward Huddleston, and
James H. Epps, III, Johnson City, for de-
fendant-appellant.

Earl R. Hendry, Bluff City, for plaintiff-
appellee.

OPINION

SANDERS, Judge.

The pivotal question on this appeal is
whether or not the published tariffs of the
telephone company are controlling in the
services it furnishes to its customers.

The defendant-appellant, United Inter-
Mountain Telephone Company [United], is
a public utility engaged in furnishing tele-
phone service in East Tennessee and South-
west Virginia. It also acts as the local
agent of American Telephone and
Telegraph Company [AT & T] in furnishing
long distance services throughout the Unit-
ed States and foreign countries.

The plaintiff-appellee, GBM Communica-
tions, Inc. d/b/a Access US [GBM], is a
Tennessee corporation with principal of-
fices in Johnson City. It is engaged in the
business of reselling telephone service to
the public. It is a customer of United. It

buys Wide Area Telephone Service [WATS] lines from United, as agent for AT & T and offers the use of these lines to its customers at rates, which are less than the rates they would be charged by United.

In order to resell the long distance service, GBM has at its place of business in North Johnson City an analog LCDS switch similar to regular PBX systems in which a computer is located. In order to get in to GBM's system its customer must dial its assigned telephone number. Upon getting a dial tone from GBM's switch the customer must then dial into the computer his assigned code number. Upon the computer recognizing the code number it will route the call over one of the WATS lines to which it is attached. The customer then dials the number he is calling to any point in the United States the same as he would dial directly a number through the use of United without using GBM. The Chancellor correctly described the functions of the equipment of United and GBM as follows:

GBM has an analog LCDS switch which is designed to accept a call in and do a least cost routing on an outgoing line and it is the type of switch used in hospitals, motels, universities and other institutions. On the ordinary WATS line, United's switch, at that time an NX–1E, partly electronic and partly mechanical, would direct the call.... When a call would start, ringing voltage would come out and would ring the bells in the telephone. When the customer took the telephone off the hook, the circuit was completed and current would flow. A meter was set up in the circuit which would run as long as the telephone was off the hook. When the calling party hung up, the request for service, or current, was supposed to stop and the meter was supposed to stop running.... Despite the fact that the caller hung up, however, there could be a request for service on the mechanical part of the NX–1E switch which would mean that the meter would run.

GBM's switch interposed an additional step between the calling party and the called party. The caller would call GBM's WATS number and when GBM's telephone rang and "picked up," the caller would dial an additional code number. If the code number were recognized by GBM's switch, it would then complete the circuit back to the Central Office (CO) of United. Immediately, GBM would route the call to the called number and when the called telephone was picked up, the connection between caller and callee was completed. Once GBM completed the circuit back to the CO [Central Office] of United, current was flowing, but insofar as billing was concerned, the connection did not start until the telephone was answered by the called party. United's timer continued until a signal was sent back through GBM that service was no longer wanted.

In September 1983 GBM ordered three WATS lines from United. United furnished these lines attached to a panel at GBM's place of business. GBM then attached its switch to these lines. These lines were to be used by GBM for customers to place calls from any place in the United States coming into Johnson City and GBM would make the connection to the local telephone. The service was designed for local businesses to receive calls from their employees or customers away from Johnson City.

At this point, it should be pointed out that United's tariffs provide for a fixed monthly charge for each WATS line, plus an amount per minute for each minute or fraction thereof that the line is in use. United had a timer on the line, which recorded the time from the instant the called party picked up the receiver until GBM's equipment signaled back that it no longer required service. If the equipment used by GBM was compatible with the equipment of United, the metering or timing by United's equipment would stop when the calling party hung up the telephone receiver.

GBM charged its customers by the minute for the use of the line, and it had a timing or metering equipment, which was designed to meter the use of the line from the time the called party picked up the

receiver until the calling party hung up. For a period of approximately two months after the three WATS lines were installed, and put in use by GBM its switching equipment failed to send back signals to United's equipment that it no longer needed the service, after GBM's customer making the incoming call hung up his receiver. This resulted in United equipment showing the line was still in use, and its meter to continue to run. During this period of time United's equipment showed the three lines in use for 508.60 hours, while GBM's equipment showed the lines to be in use for 10.58 hours.

Sometime prior to September 6, 1983, GBM leased a Foreign Exchange or "FX" line from United running from Elizabethton to Johnson City. By use of this line GBM's customers in Elizabethton could call into Johnson City without charge and place their long distance calls through GBM over the WATS lines the same as local customers.

Also, sometime prior to that date, United had decided it was going to install a more modern computerized switch system in its Elizabethton exchange. It notified all of its customers in the Elizabethton exchange of its intention to make the change. The notice which was an insert with their billing advised that if the customers owned their own telephone equipment or leased it from anyone other than United, it might not be compatible. It suggested they check to see if their equipment would be compatible with the new United equipment. United also made several press releases concerning the change, which appeared in the Elizabethton and Johnson City papers.

On September 17, 1983, United installed the new equipment. GBM's equipment was not compatible with United's new equipment and this resulted in a proper signal not being sent to United's equipment for release of the WATS lines on the calls from Elizabethton on the FX line. GBM contends as a result of these failures to disconnect it was charged some $4,000 in excess of the time its customers had the WATS lines in use.

GBM filed suit in the Chancery Court alleging the failure of the equipment to disconnect was the result of faulty equipment of United. As pertinent here, it sought a restraining order against United restraining it from disconnecting its service and asking that United be required to give it credit for some $12,000 in overcharges.

United for answer said the Chancery Court was without subject matter jurisdiction of the case, and jurisdiction was in the Tennessee Public Service Commission. It denied the failure of the equipment was due to faults of its equipment. It said GBM was improperly using United lines. GBM's problems stemmed from the fact its equipment was not compatible with United's equipment as required by its tariffs. Its charges to GBM were in compliance with its tariffs. It also filed a cross-claim alleging GBM was indebted to it in the amount of $15,098.10.

Upon the trial of the case the Chancellor found the issues in favor of GBM and ordered United to give GBM credit for $18,283.00 for excess charges. He also dismissed United's cross-complaint.

United has appealed, insisting the court did not have subject matter jurisdiction, and was in error in not transferring the case to the Tennessee Public Service Commission. It further says the court was in error in holding that United's tariffs were not applicable and that the evidence preponderated against the Chancellor's findings. We cannot agree with United's insistance that the issues here in controversy lay with the Public Service Commission.

United is, however, a public utility as defined in T.C.A. § 65–4–101. Our courts have also found that telephone companies are common carriers and public utilities within the jurisdiction of Public Utilities Commission. *See, Home Telephone Co. v. People's Telephone & Telegraph Co.,* 125 Tenn. 270, 141 S.W. 845, 848 (1911); *State v. Cumberland Telephone & Telegraph Co.,* 114 Tenn. 194, 86 S.W. 390 (1905).

By statute the Tennessee Public Service Commission is given control over

**112**

public utilities, property, property rights, facilities and franchises. It also has the power to impose conditions as to equipment, maintenance and level of service. However, the commission is not a "court", but an administrative body. *See, McCollum v. Southern Bell Telephone & Telegraph Co.,* 163 Tenn. 277, 280, 43 S.W.2d 390 (1931).

■ We do, however, find the court was in error in holding United's tariffs were not applicable in the case at bar. The published tariffs of a common carrier are binding upon the carrier and its customers and have the effect of law. The provisions of the tariffs should govern the parties. *See, City Messenger Service v. Capitol Records Distributing Corp.,* 446 F.2d 6, 7 (6th Cir. 1971), *cert. denied,* 404 U.S. 1059, 92 S.Ct. 738, 30 L.Ed.2d 746 (1972); *Carter v. American Telephone & Telegraph Company,* 365 F.2d 486, 496 (5th Cir.1966), *cert. denied,* 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d. 546 (1967).

As pertinent here, the tariffs which were in effect at the time provide:

WIDE AREA TELECOMMUNICATIONS SERVICE

F.C.C. No. 259, 2.6(A)(1) Responsibility of the Customer

The Customer is responsible for the installation, operation, and maintenance of any Customer provided terminal equipment, multiline terminating system or communications system. The connection of such equipment or system shall not require a change in or alteration of the equipment; or services of the Telephone Company; ...

F.C.C. No. 259, 2.6(B)(1) Responsibility of the Telephone Company

WATS is not represented as adapted to the use of Customer-provided terminal equipment, multiline terminating systems or communications systems. If Customer-provided equipment or systems are used with WATS, the Telephone Company will only be responsible for furnishing service components suitable for WATS and to design, maintain and operate those service components according-

ly. Subject to that responsibility, the Telephone Company will not be responsible for (a) the quality or the through transmission of signals generated by the Customer-provided equipment or system, or (b) the reception of signals by Customer-provided equipment or systems, or (c) address signaling performed by Customer-provided signaling equipment.

T.P.S.C. A19.5(1)(e)(1)

Chargeable time for a call begins when the connection is established between the WATS station and the calling or called station.

T.P.S.C. A19.5(1)(e)(2)

Chargeable time for a call ends when the calling station hangs up, thereby releasing the network connection. However, if the calling station does not hang up after the called station hangs up, then chargeable time ends when timing equipment in the network terminates the connection.

■ It will be observed from the tariffs that it is the responsibility of GBM to furnish equipment that is compatible with United's equipment and that it is not the responsibility of United to make its equipment compatible with the equipment of GBM. However, in order to solve the disconnect problems, both with WATS lines and the FX lines, United did alter its equipment. This apparently was done because GBM could not alter its equipment to correct the problem.

The tariffs also show that WATS lines are not designed to go through intermediate equipment between United's NX–1E switch and the called or calling stations. GBM's switch would not disconnect the signal after an incoming call to its equipment had terminated and the caller had hung up the telephone. This factor was influenced by the fact that United's equipment did not receive its signal from the original caller, but received its signal or call from GBM's equipment. In other words, the caller to GBM's equipment was not United's customer. GBM was United's customer. GBM was the one that paid United and controlled the call to United.

Because the signal had to pass through GBM's switch, United's equipment did not respond to the person originating the call to GBM hanging up the receiver. In order to correct the problem, it was necessary for United to change the wiring in its system and to remove a signal, which allows United to detect trouble on a line, from the lines going to GBM. Other than the lines used by GBM, this signal is on all other lines throughout United's entire system. Although not controlling, it is of interest to note that from the very beginning of the use of the WATS lines, GBM learned the signal on the lines did not disconnect from its switch, but it is unexplained in the record why GBM continued to use the system and to permit such large amount of use time to accumulate.

The disconnect problems on FX lines developed when United installed its new switching equipment. The record shows that United changed this equipment about two a.m. on Saturday or Sunday night. Monday morning GBM found all three WATS lines had failed to disconnect and was advised the new switching system gave out a three hundred milisecond disconnect and GBM would have to adjust its equipment to recognize this disconnect signal. Here again, GBM did not change its equipment to recognize the three hundred milisecond disconnect signal. Later, United reprogramed its equipment to be compatible with GBM's equipment. Also, GBM learned of the problem on September 17th, but continued to use the incompatible equipment for approximately three weeks, until United reprogramed its equipment. During this period some $4,000 in use time was incurred.

In his determination of the case, the Chancellor rationalized that because the changes, which were made to make the two systems compatible, were made in United's equipment, and GBM made no changes in its equipment, the fault lay with United. This rationale apparently was prompted by the Chancellor's holding United's published tariffs were not applicable.

The Chancellor also found that United did not suffer any loss as a result of the lines not disconnecting. This is contrary to the proof in the record. The unrefuted proof is that although there was no communication on the lines, the 282 exchange equipment of United was seized during all of the time the lines were connected, and other United customers could not use the equipment. The proof further shows the time the lines were connected was being logged on the timer and this time was charged to United by AT & T in making settlement charges for the use of the lines.

The issues are found in favor of the appellant. The decree of the Chancellor is reversed and the plaintiff's complaint is dismissed. The case is remanded for the entry of a decree in keeping with this opinion and appropriate proceedings on United's counter-claim. Cost of this appeal is taxed to the appellee.

PARROTT, P.J., and GODDARD, J., concur.