TENNESSEE CABLE TELEVISION ASSOCIATION, et al.,
Petitioners,

v.

TENNESSEE PUBLIC SERVICE COMMISSION, et al.,
Respondents.

Court of Appeals of Tennessee,
Middle Section, at Nashville.

July 2, 1992.

On Rehearing July 24, 1992.

Permission to Appeal Denied
by Supreme Court
Dec. 7, 1992.

William B. Hubbard, Weed, Hubbard & Berry, Nashville, John D. Sevier, Cole, Raywid & Braverman, Washington, DC, for Tennessee Cable Television Ass'n.

Henry Walker, TN Public Service Com'n, Nashville, for Tennessee Public Service Com'n.

Jay R. Gentry Ortiz, Atlanta, GA, Valerius Sanford, Gullett, Sanford, Robinson & Martin, Nashville, for AT & T Communications of the South Central States, Inc.

## OPINION

KOCH, Judge.

This appeal involves the Tennessee Public Service Commission's decision to require South Central Bell Telephone Company to accelerate the modernization of its network using projected excess earnings. Three associations representing commercial and residential telephone customers filed Tenn. R.App.P. 12 petitions for review, asserting that the Commission should have ordered South Central Bell to refund its excess earnings rather than to spend them to implement a modernization plan that the Commission had not yet properly adopted. While the Commission's authority over excess earnings is not limited to refunds or rate reductions, we have determined that the Commission acted arbitrarily and abused its discretion in this case. Accordingly, we vacate the portion of the Commission's order requiring South Central Bell to spend $111.5 million to implement new technologies in accordance with modernization plans that have yet to be adopted.

### I.

The 1980's brought major technological changes and significant federal regulatory reform to the telecommunications industry. The Tennessee Public Service Commission ("Commission"), having regulatory authority over the telephone companies in this state, decided that it should respond to these changes. This case involves the pro-

cess embarked upon by the Commission to become the "catalyst in shaping and overseeing the technology deployment plans of the [telecommunications] industry."

In October 1988, the Commission appointed a task force to study alternative methods for regulating the telephone companies under its jurisdiction. The task force included members of the Commission's staff and five representatives of Tennessee's telecommunications companies, including South Central Bell Telephone Company ("South Central Bell"). Approximately one year later, the Commission also retained a consultant to develop a ten-year strategy for modernizing Tennessee's telephone network. The work of the consultant and the deliberations of the task force proceeded concurrently, and their recommendations were intended to be complementary and synergistic.

The task force issued its "Tennessee Regulatory Reform Plan" on July 10, 1990. The plan, embodying a compromise between the telecommunications industry and the Commission's staff, recommended that the Commission relax the regulation of non-basic monopoly services and provide telephone companies with financial incentives to operate more efficiently. It required Tennessee's two large local exchange companies[1] to commit to a "ten-year blueprint for deploying technology to enhance the telecommunications infrastructure in Tennessee" and, in return, permitted them to distribute their projected excess earnings to their customers "in the form of accelerated technology deployment or rate reductions."

The consultant presented its final report on July 30, 1990. The report, entitled "Telecommunications Technology Deployment Analysis and Master Plan Development," recommended the adoption of a ten-year master plan for the deployment of digital switching and fiber optic transmission technologies in Tennessee's telephone network. It envisioned that the telephone companies would (1) deploy "intelligent network services" in the five urban counties by 1991 and in the rest of the state by 1993; (2) deploy "integrated services or digital networks" in urban areas by 1998 and in the rest of the state by 2000; and (3) offer "broadband" (fiber optic) capability in urban areas beginning in 1995, in suburban areas in 1997, and in rural areas in 1999. Broadband services would grow slowly under the plan, reaching 10% penetration in urban areas, 5% in the suburbs, and 2% in rural areas by 2000. The technology master plan anticipated that these improvements would be paid for with the excess earnings generated under the regulatory reform plan.

In addition to improving the telephone companies' ability to provide traditional telecommunications services, the improvements envisioned in the technology master plan would also enable the telephone companies to enter into new service delivery areas. Among the advanced services available through fiber optics technology would be the ability to transmit video signals over the telephone lines to consumers' homes.

The Commission considered both the regulatory reform plan and the technology master plan at its July 31, 1990 meeting. It approved both plans "subject to hearing and public comment" and directed its staff to distribute copies of the plan to the news media, local governmental officials, all local exchange and inter-exchange carriers, and other interested persons. The notice requested comments or requests for a hearing within thirty days.

Even before the Commission took final action on either the regulatory reform plan or the technology master plan, the Commission's staff began to implement both plans by negotiating with South Central Bell to determine the company's projected excess earnings between January 1, 1990 and December 31, 1993. When the staff and South Central Bell reached an impasse in their negotiations,[2] the Commission entered

---

1. Large local exchange companies are those with 70,000 or more local access lines. At all relevant times, only South Central Bell and

United Inter–Mountain Telephone Company qualified as large local exchange companies.

2. South Central Bell projected that its excess earnings for the three-year period beginning on

an order on July 23, 1990, directing South Central Bell to show cause why it should not be required to reduce its earnings to a just and reasonable level. While the notice did not indicate how the Commission intended to distribute the excess earnings, all parties knew that the excess earnings would be used, at least in part, to modernize South Central Bell's network.

Tennessee's cable television companies viewed enabling the telephone companies to transmit video signals as a competitive threat. Accordingly, the Tennessee Cable Television Association ("TCTA"), a trade group representing forty-five cable television companies operating in Tennessee, mounted an all out assault on the regulatory reform plan and the technology master plan. The TCTA intervened in South Central Bell's earnings investigation and also requested permission to participate in the Commission's hearings with regard to the approval of the regulatory reform plan and the technology master plan. It asserted that its members would benefit from reductions in rates and access charges and that they would be harmed if South Central Bell were permitted to subsidize its entry into new "competitive ventures" using projected excess earnings from its telephone operations.

The Commission conducted a hearing on August 1, 1990 to resolve the impasse concerning the amount of South Central Bell's projected excess earnings. It determined that the company's excess earnings for the three-year period beginning on January 1, 1990 would be $157.3 million,[3] and on August 8, 1990, issued a public notice stating that it would hold a hearing on October 3, 1990 "to hear evidence and argument from the parties concerning the proper disposition of these excess revenues."

On September 28, 1990, the Commission entered an order concerning the amount of South Central Bell's excess earnings. Even though its hearing on the distribution of these earnings was still days away, the Commission decided that South Central Bell's excess earnings would be spent in five general areas, including $111.5 million "to implement the ten year, master plan for technology deployment ... approved by the Commission in Docket 90–06255, and such other modernization projects, such as video overlay, as the Commission directs." The Commission also directed South Central Bell to begin operating under the "incentive sharing plan" in the regulatory reform plan.

The Commission, in conjunction with Tennessee's telephone companies, also began the aggressive promotion of a state-wide series of technology conferences designed to introduce the technology master plan and the regulatory reform plan—now called "FYI Tennessee" to the public. Even though the Commission had not yet adopted or even held hearings on these plans, the Commission's literature stated that the purpose of the conferences was to provide a better understanding concerning "how all Tennesseans will benefit from new service capabilities."

On the eve of South Central Bell's earnings investigation hearing, the TCTA filed motions requesting each of the commissioners to recuse himself from South Central Bell's excess earnings investigation, asserting that they were biased in favor of South Central Bell's position with regard to the distribution of the excess earnings. The TCTA also filed petitions for declaratory orders questioning the propriety of deciding on the distribution of South Central Bell's excess earnings using either the regulatory reform plan or the technology master plan since the Commission had not yet formally promulgated either plan as a rule.

The commissioners denied the TCTA's recusal motions and proceeded with the October 3, 1990 hearing without acting on the TCTA's petitions for declaratory orders. On November 30, 1990, while its decision on the excess earnings was still pending, the Commission filed a formal no-

January 1, 1990 would be $135.6 million; while the Commission's staff projected that the excess earnings for the same period would be $205.8 million.

**3.** The Commission projected that the company would accrue $35.1 million in excess revenues in 1990; $47.9 million in 1991; and $74.3 million in 1992.

tice of a rulemaking hearing concerning "the adoption of a four year experimental regulatory reform plan" and "the adoption of a ten year technology deployment plan which will become the blueprint for the modernization of the telephone network across the State of Tennessee."

On December 3, 1990, the TCTA and two other associations[4] filed a petition for review in this court seeking appellate review of the Commission's apparent denial of the TCTA's petitions for declaratory orders and its denial of the TCTA's petition to reconsider the part of the September 28, 1990 order putting portions of the regulatory reform plan into effect for South Central Bell before the plan was formally adopted.

On December 19, 1990, the Commission entered orders finding that the earlier proceedings involving the adoption of the regulatory reform plan and the technology master plan were moot because of its decision to promulgate these plans through rulemaking rather than adjudication. On January 17, 1991, the Commission also entered its final order in South Central Bell's excess earnings investigation. It confirmed its earlier decision requiring South Central Bell to allocate $111.5 million of its projected excess earnings to a deferred revenue account "which will be used to implement, during 1991 and 1992, the initial steps of the ten-year modernization plan described in this order [the technology master plan]."

The Commission's January 17, 1991 order also addressed the TCTA's concern that South Central Bell would use its modernized network to gain entry into the domestic video entertainment market. In a footnote, the Commission also pointed out that

Nothing in this order is intended to indicate that the Commission supports the idea of using ratepayer funds to finance Bell's entry in the cable television business. To the contrary, the Commission opposes such use and reiterates its position that, except in the area of directory information, the telephone company should serve as a common carrier "pipeline" for information or entertainment services provided by other vendors, and not as a provider of the information itself.

On February 15, 1991, the TCTA and the TAB filed a second petition for review seeking this court to review the Commission's orders denying the recusal motions and its September 28, 1990 and January 17, 1991 orders. We consolidated this petition for review with the one filed earlier on December 3, 1990.

Even though these appeals were pending, the Commission proceeded with the formal rulemaking proceedings concerning the adoption of the regulatory reform plan and the technology master plan. The Commission conducted the rulemaking hearing on February 20, 1991 but has yet to promulgate either the regulatory reform plan or the technology master plan.

## II.

We direct our attention first to the Commission's prerogatives when it determines that a utility has or will receive excess earnings. The TCTA and its fellow intervenors assert that the Commission's authority is limited to reducing rates or to ordering refunds. We do not construe the Commission's authority so narrowly. Since rates and service are intertwined in Tennessee, we find that the Commission has the authority to require a utility to use projected excess earnings to expand or improve service to its customers.

### A.

■ The Commission is an administrative agency exercising co-mingled legislative, executive, and judicial functions. *Blue Ridge Transp. Co. v. Pentecost,* 208 Tenn. 94, 96, 343 S.W.2d 903, 904 (1961); *Louisville & Nashville R.R. v. Fowler,* 197 Tenn. 266, 274, 271 S.W.2d 188, 192 (1954);

---

4. The TCTA was joined by the Tennessee Association of Broadcasters ("TAB") representing 135 radio stations and 13 television stations in Tennessee and the Tennessee Association of Retired Persons State Legislative Committee ("TARP") purporting to represent over 500,000 members of the American Association of Retired Persons in Tennessee.

*GBM Communications, Inc. v. United Inter-Mountain Tel. Co.*, 723 S.W.2d 109, 112 (Tenn.Ct.App.1986). Rate-making is one of the essentially legislative functions that has been delegated to the Commission. Tenn.Code Ann. § 65–5–201 (1982); *Southern Bell Tel. & Tel. Co. v. Tennessee Pub. Serv. Comm'n*, 202 Tenn. 465, 486, 304 S.W.2d 640, 649 (1957); *McCollum v. Southern Bell Tel. & Tel. Co.*, 163 Tenn. 277, 280, 43 S.W.2d 390, 390–91 (1931).

■ When the General Assembly empowered the Commission to fix rates, it also signaled its clear intent to vest in the Commission practically plenary authority over the utilities within its jurisdiction. *Patterson v. City of Chattanooga*, 192 Tenn. 267, 277–78, 241 S.W.2d 291, 295 (1951). Tenn.Code Ann. § 65–4–104 (1982) provides that the Commission "shall have general supervision and regulation of, jurisdiction, and control over, all public utilities ... so far as may be necessary for the purpose of carrying out the provisions of this chapter." Similarly, Tenn.Code Ann. § 65–4–106 (1982) provides:

> This chapter shall not be construed as being in derogation of the common law, but shall be given a liberal construction, and any doubt as to the existence or extent of a power conferred by this chapter or chapters 1, 3 and 5 of this title, on the commission shall be resolved in favor of the existence of the power, to the end that the commission may effectively govern and control the public utilities placed under its jurisdiction by this chapter.

These statutes undoubtedly require a liberal rather than a narrow interpretation of the existence of the Commission's authority. *Breeden v. Southern Bell Tel. & Tel. Co.*, 199 Tenn. 203, 211, 285 S.W.2d 346, 350 (1955). However, the Commission's powers remain rooted in its enabling legislation, *Tennessee Pub. Serv. Comm'n v. Southern Ry.*, 554 S.W.2d 612, 613 (Tenn. 1977); *Tennessee–Carolina Transp., Inc. v. Pentecost*, 206 Tenn. 551, 556, 334 S.W.2d 950, 953 (1960), and so its actions must be harmonious and consistent with its statutory authority. *Pharr v. Nashville,*

*Cincinnati & St. Louis Ry.*, 186 Tenn. 154, 161, 208 S.W.2d 1013, 1016 (1948).

### B.

■ The General Assembly intended to leave rate-making to the Commission's technical competence and specialized knowledge. *CF Indus. v. Tennessee Pub. Serv. Comm'n*, 599 S.W.2d 536, 540 (Tenn. 1980). The only limit it placed on the Commission was that the rates must be "just and reasonable." Tenn.Code Ann. § 65–5–201. The breadth of the Commission's authority has prompted the Tennessee Supreme Court to characterize rate-making as essentially "a value judgment made by the Commission in the exercise of its sound regulatory judgment and discretion." *CF Indus. v. Tennessee Pub. Serv. Comm'n*, 599 S.W.2d at 542.

Accordingly, rates need not be determined using definite rules or precise formulas. A rate need only fall within the "zone of reasonableness," *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 770, 88 S.Ct. 1344, 1361, 20 L.Ed.2d 312 (1968); *Southern Bell Tel. & Tel. Co. v. Tennessee Pub. Serv. Comm'n*, 202 Tenn. at 483, 304 S.W.2d at 648, that takes into consideration the interests of both the consumer and the utility. *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944); *Southern Bell Tel. & Tel. Co. v. Tennessee Pub. Serv. Comm'n*, 202 Tenn. at 471, 304 S.W.2d at 642–43.

■ Rate-making requires the Commission to balance and weigh many factors. *Boone County Rural Elec. Membership Corp. v. Indiana Pub. Serv. Comm'n*, 239 Ind. 525, 159 N.E.2d 121, 125 (1959). Tenn. Code Ann. § 65–5–201 imposes no limits on the factors the Commission may consider and, in fact, specifically permits the Commission to consider "the safety, adequacy and efficiency or lack thereof of the service or services furnished by the public utility."

■ A rate should be reasonable not only when it is first established but also for a reasonable time thereafter. *McCardle v. Indianapolis Water Co.*, 272 U.S. 400,

408–09, 47 S.Ct. 144, 148, 71 L.Ed. 316 (1926); *Southern Bell Tel. & Tel. Co. v. Tennessee Pub. Serv. Comm'n*, 202 Tenn. at 482, 304 S.W.2d at 647. Thus, when the Commission is considering whether a rate is just and reasonable, it "should take into consideration the estimated effect of reasonably expected expenses and investments." *Southern Bell Tel. Co. v. Tennessee Pub. Serv. Comm'n*, 579 S.W.2d 429, 435 (Tenn.Ct.App.1979) (emphasis in original deleted).

### C.

■ A telephone company's financial integrity and the adequacy of its service are inextricably linked in rate-making and adequacy-of-service proceedings. The Commission must always maintain the company's financial integrity. *Southern Bell Tel. & Tel. Co. v. Tennessee Pub. Serv. Comm'n*, 202 Tenn. at 483, 304 S.W.2d at 647–48. Accordingly, the Commission must consider the adequacy of the company's service when it is fixing rates, *see* Tenn.Code Ann. § 65–5–201; *South Cent. Bell Tel. Co. v. Tennessee Pub. Serv. Comm'n*, 12 P.U.R.4th 157, 158–59 (Davidson Chanc. Aug. 12, 1975), and must consider the company's financial condition before requiring it to establish new service or to expand existing service. Tenn.Code Ann. § 65–4–113(2) (1982); *South Cent. Bell Tel. Co. v. Tennessee Pub. Serv. Comm'n*, 579 S.W.2d at 438–39.

■ A telephone company should not be expected to provide adequate service when its rates are unreasonably low, *South Cent. Bell Tel. Co. v. Tennessee Pub. Serv. Comm'n*, 579 S.W.2d at 437–38. By the same token, it should not necessarily expect to receive the rates it considers to be just and reasonable when its service is not adequate or efficient. Accordingly, the Commission has, on at least one occasion, conditioned the receipt of a portion of a rate increase on a telephone company's improvement of its service. *In re Tennessee Tel. Co.*, 4 P.U.R.4th 68, 84 (Tenn.Pub.Serv. Comm'n Jan. 3, 1974).

■ The enabling statutes do not specifically delineate the Commission's powers when it projects that a telephone company will receive excess earnings if it continues providing the same services at its present rate. Tenn.Code Ann. §§ 65–4–104, –106 give the Commission broad power to regulate the services provided by the company and the rates the company charges for these services. Thus, when the Commission determines that a telephone company's earnings will be excessive if the company is permitted to continue to charge the same rate for the same services, the Commission, exercising its regulatory discretion and expertise, may (1) reduce the rate prospectively, (2) order refunds in cases where the rates were put into effect under bond pursuant to Tenn.Code Ann. § 65–5–203 (Supp. 1991), or (3) require that the excess earnings be used to extend or improve the company's service.

### III.

The next issue concerns the alternatives available to the Commission to exercise its regulatory power. The TCTA asserts that the Commission should not have used a contested case proceeding to adopt its regulatory reform plan and its technology master plan. We agree. While the Commission has substantial discretion to establish policy either through rule-making or adjudication, we have determined that the Commission acted arbitrarily and capriciously in this case when it based its disposal of a contested case proceeding upon a proposed rule that had not yet been promulgated.

### A.

Administrative agencies typically perform both legislative and adjudicative functions. These functions are closely related, and the line between them is not always clear. *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 770, 89 S.Ct. 1426, 1432, 22 L.Ed.2d 709 (1969) (Black, J., concurring); *Shoreline Transp., Inc. v. Robert's Tours & Transp., Inc.*, 70 Haw. 585, 779 P.2d 868, 872 (1989).

■ Rulemaking is essentially a legislative function because it is primarily con-

cerned with considerations of policy. 2 Kenneth C. Davis, *Administrative Law Treatise* § 7.2,'at 7 (2d ed. 1979) ("Davis"); Robert W. Ginnane, *"Rulemaking," "Adjudication" and Exemptions under the Administrative Procedures Act,* 95 U.Pa. L.Rev. 621, 630 (1947). It is the process by which an agency lays down new prescriptions to govern the future conduct of those subject to its authority. Bernard Schwartz, *Administrative Law* § 4.15, at 190 (2d ed. 1984) ("Schwartz"); 1 Charles H. Koch, *Administrative Law & Practice* § 2.3, at 61–62 (1985) ("Koch"). Adjudication, on the other hand, involves individual rights or duties and the determination of disputed factual issues in particular cases. Davis, *supra,* § 7.2, at 5; Koch, *supra,* § 2.3, at 57–58. It is the process by which an agency applies either law or policy, or both, to a particular set of facts. Schwartz, *supra,* § 4.15, at 190.

■ The Commission, like other administrative agencies, must base the exercise of its rulemaking or adjudicatory authority on state law. Tenn.Code Ann. § 65–2–102(2) (Supp.1991) empowers the Commission to "adopt rules implementing, interpreting, or making specific the various laws which it enforces or administers." In addition to the procedural requirements contained in Tenn.Code Ann. §§ 65–2–102, –103, the Commission must also follow the Uniform Administrative Procedures Act's rulemaking procedures. *See U.S. Life Title Ins. Co. v. Department of Commerce & Ins.,* 770 S.W.2d 537, 541 (Tenn. Ct.App.1988).

The two statutory schemes define "rule" similarly. Tenn.Code Ann. § 65–2–101(2) (1982) provides that a rule includes "[e]very regulation, or statement of policy, or interpretation of general application and future effect ... adopted by the Commission ... to implement or make specific the laws enforced or administered by it, or to govern its organization and procedures." Tenn. Code Ann. § 4–5–102(10) (1991) likewise defines a rule as "each agency statement of general applicability that implements or prescribes law or policy or describes the procedures or practice requirements of any agency."

The statutes also contain similar definitions of an adjudicatory or contested case proceeding. Tenn.Code Ann. § 65–2–101(3) defines a contested case as "[a]ll proceedings before the commission in which the legal rights, duties, or privileges of specific parties are determined after a hearing before the commission." By the same token, Tenn.Code Ann. § 4–5–102(3) defines a contested case as "a proceeding ... in which the legal rights, duties or privileges of a party are required by any statute or constitutional provision to be determined by an agency after an opportunity for a hearing." Tenn.Code Ann. § 4–5–102(3) also specifically states that rate-making proceedings are contested cases, and Tenn.Code Ann. § 65–2–101(3) states that "the fixing of rates shall be deemed a contested case rather than a rule-making proceeding."

### B.

■ The statutes clearly empower the Commission to promulgate rules for the complete operation and enforcement of the laws it administers and to conduct contested case proceedings to fix the rates of the utilities under its jurisdiction. However, the statutes provide no clear guidelines for an agency's decision whether to exercise its authority through rulemaking or case-by-case adjudication.

■ Many federal and state courts have held that the choice between rulemaking and adjudication lies "primarily in the informed discretion of the administrative agency." *SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947); Davis, *supra,* § 7.25, at 120–21; Koch, *supra,* § 2.14, at 17 (Supp.1990); 3 Glenn A. Mitchell, Basil J. Mezines & Jacob A. Stein, *Administrative Law* § 14.01[3] (1992). While these decisions are not binding on this court,[5] we joined with these states six years ago when we held that the

---

5. *See Bally Mfg. Corp. v. New Jersey Casino Control Comm'n,* 85 N.J. 325, 426 A.2d 1000, 1007 n. 1 (1981); *State ex rel. Utils. Comm'n v. Nantaha-*
*la Power & Light Co.,* 326 N.C. 190, 388 S.E.2d 118, 124 (1990).

choice between rulemaking and adjudication is "in the first instance, within the agency's discretion." *Kopsombut–Myint Buddhist Ctr. v. State Bd. of Equalization,* 728 S.W.2d 327, 331 (Tenn.Ct.App. 1986) (quoting *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974)).

However, as we noted in *Kopsombut–Myint,* an agency's discretion is not unlimited and may, in fact, be abused. *NLRB v. Bell Aerospace Co.,* 416 U.S. at 294, 94 S.Ct. at 1771; *St. Barnabas Medical Ctr. v. New Jersey Hosp. Rate Setting Comm'n,* 250 N.J.Super. 132, 593 A.2d 806, 811 (App.Div.1991); *CBS, Inc. v. Comptroller of the Treasury,* 319 Md. 687, 575 A.2d 324, 327 (1990). Substantial discretion does not immunize an agency's decision from considerations of fairness. *Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 745 S.W.2d 918, 926 (Tex.Ct.App. 1988).

■ Rulemaking is the preferable way to formulate new policies, rules, or standards. *SEC v. Chenery Corp.,* 332 U.S. at 202, 67 S.Ct. at 1580. Thus, several federal courts and even more state courts have developed tests to determine when rulemaking procedures are necessary in order to validate an agency's actions or determinations. As a general matter, these courts require rulemaking when an agency uses its legislative power to implement a generally worded regulatory statute.

One federal court has held that an agency must proceed by rulemaking if its seeks to change the law and establish rules of widespread application. *Ford Motor Co. v. FTC,* 673 F.2d 1008, 1009 (9th Cir.1981), *cert. denied,* 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d 394 (1982). Other federal courts have reached the same conclusion when the adjudicatory proceeding changes well-established policy upon which there had been significant reliance. *NLRB v. Niagra Mach. & Tool Works,* 746 F.2d 143, 151 (2d Cir.1984); *Ka Fung Chan v. INS,* 634 F.2d 248, 257 (5th Cir. Jan. 1981).

A number of state courts agree with these federal decisions. They have noted that proceeding on a case-by-case basis is appropriate in the context of a relatively new statute or rule, *Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 745 S.W.2d at 926, or when an agency has not solidified its position concerning an incipient or evolving policy. *City of Tallahassee v. Florida Pub. Serv. Comm'n,* 433 So.2d 505, 507–08 (Fla.1983). However, they have also deemed rulemaking to be mandatory when the agency's action is concerned with broad policy issues that affect a large segment of a regulated industry or the general public. *Home Builders Ass'n of Metro. Denver v. Public Utils. Comm'n,* 720 P.2d 552, 561–62 (Colo.1986); *Aluli v. Lewin,* 73 Haw. 56, 828 P.2d 802, 804 (1992); *CBS, Inc. v. Comptroller of the Treasury,* 575 A.2d at 328; *Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 745 S.W.2d at 927.

■ The line between an agency's adjudicatory and rulemaking powers is not always clear. Acknowledging that drawing the distinction may sometimes be difficult, the Supreme Court of New Jersey has held that an agency's determination should take the form of rulemaking

if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.

*Metromedia, Inc. v. Director, Div. of Taxation,* 97 N.J. 313, 478 A.2d 742, 751 (1984). We find the *Metromedia* test to be compatible with our own view of when rulemaking rather than adjudicatory proceedings are required.

### C.

The Commission chose a rather curious, circuitous process for putting its regulatory reform plan and its technology master plan into effect. Its first action was to simply announce on July 31, 1990 that it had "approved" both plans "subject to hearing and public comment." Its second action was to commence a "contested" rate-making hearing involving South Central Bell for the purpose of implementing both plans. Its third action was to determine, in accordance with the plans, that the company's projected excess earnings would be $157.3 million and to order that $111.5 million of these earnings be spent to upgrade the company's network as required by the technology master plan. It was only after all these steps had been taken that the Commission was prodded into initiating the formal rulemaking procedures required by the Uniform Administrative Procedures Act.

 The statutory rulemaking procedures are mandatory with regard to the commission's policy statements that are not specifically exempted in Tenn.Code Ann. §§ 4–5–102(10), 65–2–101(2), 65–2–102. Thus, the Commission must substantially comply with the Uniform Administrative Procedures Act's requirements when it promulgates a rule. *See U.S. Life Title Ins. Co. v. Department of Commerce & Ins.,* 770 S.W.2d at 541; *see also Home Builders Ass'n of Metro Denver v. Public Utils. Comm'n,* 720 P.2d at 562. Doing so benefits the Commission by enabling it to receive a broad range of comment that it might not otherwise receive, *CBS, Inc. v. Comptroller of the Treasury,* 575 A.2d at 328; *Metromedia, Inc. v. Director, Div. of Taxation,* 478 A.2d at 751; Davis, *supra,* § 7.25, at 119, and by enhancing the public's confidence in the fairness and thoroughness of the proceeding. *Aluli v. Lewin,* 828 P.2d at 804–05; *St. Barnabas Medical Ctr. v. New Jersey Hosp. Rate Setting Comm'n,* 593 A.2d at 813–14. It also benefits the public by providing a fairer, more efficient means for expressing its views to the agency before the agency finally adopts a policy. Koch, *supra,* § 2.16, at 82–83; David L. Shapiro, *The Choice of Rulemaking or Adjudication in the Development of Administrative Policy,* 78 Harv.L.Rev. 921, 929–32 (1965).

 The Commission effectively conceded that both its regulatory reform plan and its technology master plan should have been promulgated as rules when it filed its formal rulemaking notice in November, 1990. Both plans, in fact, meet all of *Metromedia's* criteria for choosing rulemaking over adjudication. They embody broad statements of new regulatory policy not found in the statutes. The technology master plan contains service standards not previously required by the Commission, and the regulatory reform plan embodies material and significant changes in the Commission's rate-making process for regulated telecommunications companies. Both plans apply to a large segment of a regulated industry and, when implemented, will have a significant effect upon the general public.

The Commission's "approval" of the plans in July, 1990 was invalid and ineffectual. At that time, neither plan had been promulgated as a rule in accordance with the Uniform Administrative Procedures Act's or the Commission's own rulemaking requirements. Similarly, the Commission's decision to implement the plans in a contested case proceeding involving South Central Bell was improper because the plans contained general policy statements more properly amendable to rulemaking than adjudication.

 This court may vacate an agency's decision in a contested case when the agency's procedure violates statutory provisions or is otherwise unlawful. Tenn.Code Ann. § 4–5–322(h)(1), –322(h)(3) (1991). We may also vacate a decision when it is "arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise

of discretion." Tenn.Code Ann. § 4–5–322(h)(4). We have determined that the Commission abused its discretion by attempting to implement its regulatory reform plan and technology master plan through adjudication rather than through rulemaking.

It is at this point that we must disagree with the dissent's position that the Commission's disposition of South Central Bell's excess earnings can be considered separately from the adoption of the regulatory reform plan and technology master plan. The commission has inextricably bound these issues together, and it would be inappropriate, although perhaps convenient, for this Court to consider them separately.

Broad acceptance by the regulated telecommunications industry is an essential ingredient to the technology master plan. It is so essential that a company's right to obtain the benefits of the regulatory reform plan is expressly conditioned on its binding commitment to make the technological improvements in the technology master plan. The regulatory reform plan is nothing more than a mechanism to generate funds to pay for the technical improvements required by the technology master plan.

Both South Central Bell and United Inter–Mountain Telephone Company are required to participate in both the regulatory reform plan and the technology master plan. Thus, by requiring South Central Bell to begin implementing both plans, the Commission has set in motion a process that will eventually require United Inter–Mountain Telephone Company and many other small telephone companies to do the same thing.

Both the regulatory reform plan and the technology master plan embody significant and dramatic changes in the Commission's regulatory procedures and philosophy. It is clear that the rest of the regulated telecommunications industry will be required to follow South Central Bell and that the Commission would not have required South Central Bell to undertake the modernization of its network if it did not anticipate requiring United Inter–Mountain Telephone Company and the other companies to do the same thing.

These are the essential reasons why the Commission should have used formal rulemaking proceedings to adopt the regulatory reform plan and the technology master plan. Choosing an adjudicatory proceeding with only one company was an abuse of discretion. It follows, therefore, that the Commission acted arbitrarily when it based its decision with regard to South Central Bell's excess earnings on plans that had not yet been properly adopted. Accordingly, the portions of the Commission's orders must be vacated.

## IV.

The TCTA also renews its claim that the members of the Commission should have recused themselves because they had prejudged the disposition of South Central Bell's projected excess rates. Much of the force of the TCTA's arguments have been diluted by our decision that the Commission should have pursued its policy objectives through rulemaking not adjudication. The disqualification standard applicable to rulemaking proceedings differs from those applicable to adjudicatory proceedings.

## A.

The role agency members play in rulemaking proceedings differs significantly from their role in adjudicatory proceedings. They are less likely to be required to resolve disputed fact issues and are more likely to be required to use their experience and expertise to make policy judgments. Thus, the view that an agency member is a neutral and detached adjudicator is "simply an inapposite role model for an administrator who must translate broad statutory commands into concrete social policies." *Association of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1168–69 (D.C.Cir.1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980).

█ When agency members are performing adjudicatory functions, they must abide by the same disqualification standards that are applicable to judges. Tenn.

Code Ann. § 4–5–302(a) (1991). An agency member is subject to disqualification if his or her "impartiality might reasonably be questioned." Tenn.S.Ct.R. 10, Canon 3C(1); William Bates, *Disqualification of Administrative Officers,* 13 Mem.St.U.L.Rev. 501, 505–08 (1983) ("Bates"). Thus, the United States Court of Appeals for the District of Columbia has pointed out that the standard for disqualifying an agency member because of prejudgment in an adjudicatory proceeding is whether "a disinterested observer may conclude that [the agency] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it." *Cinderella Career & Finishing Schools, Inc. v. FTC,* 425 F.2d 583, 591 (D.C.Cir.1970) (quoting *Gilligan, Will & Co. v. SEC,* 267 F.2d 461, 469 (2d Cir.), *cert. denied,* 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959)).

▩ Rulemaking is a type of proceeding where an agency member's policy biases gained from experience and expertise become an integral part of the process. Koch, *supra,* § 4.71, at 273. Accordingly, bias in the form of a crystallized point of view about issues of law or policy is rarely, if ever, sufficient to require an agency member's disqualification from a rulemaking proceeding. 3 Kenneth C. Davis, *Administrative Law Treatise* §§ 19.1, at 371, 19.2, at 342, 19.7, at 401 (2d ed. 1980); Koch, *supra,* § 4.73; Bates, *supra,* 13 Mem.St.U.L.Rev. at 513. The test for determining whether an agency member should be disqualified from a rulemaking proceeding on the ground of prejudgment is whether the agency member "has an unalterably closed mind on matters critical to the disposition of the proceeding." *Association of Nat'l Advertisers, Inc. v. FTC,* 627 F.2d at 1170.

▩ The constitutionally-mandated deference to an administrative agency's legislative prerogatives also requires imposing a greater burden of proof on parties seeking to disqualify agency members from rulemaking proceedings. Peter L. Strauss, *Disqualification of Decisional Officials in Rule-making,* 80 Col.L.Rev. 990, 1049 (1980). There is a strong presumption that administrative agencies have properly discharged their statutory duties. *Kentucky–Tennessee Light & Power Co. v. Dunlap,* 181 Tenn. 105, 111, 178 S.W.2d 636, 638 (1944); *Nashville, Cincinnati & St. Louis Ry. v. Railroad & Pub. Utils. Comm'n,* 161 Tenn. 592, 600–01, 32 S.W.2d 1043, 1045 (1930). Thus, persons seeking to disqualify an agency member from a rulemaking proceeding must support their motion by clear and convincing evidence. *Association of Nat'l Advertisers, Inc. v. FTC,* 627 F.2d at 1170.

C.

The manner in which the Commission has gone about formulating its technology modernization policies raises legitimate concerns. The companies that stood to benefit most from the regulatory changes played a significant role in formulating them. If the regulatory reform plan and the technology master plan are adopted, the companies will be able to modernize their networks without seeking additional debt or equity financing and will also be poised to enter into new competitive markets.

The concerns about the formulation of the Commission's policies are only deepened by the way the Commission has gone about trying to implement them. The Commission "approved" its new policies before receiving any public comment and then attempted to implement them before completing the required rulemaking process. This wholesale circumvention of orderly rulemaking process calls the fairness of the entire process into question.

The TCTA's disqualification arguments are, however, premised on adjudicatory rather than rulemaking standards. Since we have vacated the Commission's adjudicatory decision and have directed the Commission to complete its rulemaking procedure, we need only review the bias issue using the rulemaking standards.

▩ This record does not contain clear and convincing evidence that any of the commissioners have an unalterably closed mind on the matters critical to the develop-

ment and adoption of the regulatory reform plan and the technology master plan. The commissioners' orders denying the recusal motions state that they have open minds concerning their plans. Moreover, with specific reference to the TCTA's primary concern that telephone companies will use their new technology to enter the home video entertainment market, the Commission's January 17, 1991 order clearly demonstrates that the Commission's policy favors the cable television industry, not the telephone companies.

## V.

We need not dwell on the TCTA's final issue concerning the evidentiary support for the Commission's September 28, 1990 and January 17, 1991 orders since we have vacated them and remanded the case for further rulemaking. Modernizing Tennessee's telephone network prior to widespread consumer demand is, in the words of one expert witness, a "complicated chicken and egg kind of situation." The General Assembly created the Commission to deal with these types of issues, and thus the courts should decline to second-guess the Commission's exercise of its discretion and expertise.

The standard of review in Tenn.Code Ann. § 4–5–322(h)(5) does not apply to rulemaking proceedings. Accordingly, we must also decline to examine and evaluate the factual assumptions undergirding the Commission's policy decisions.

## VI.

We vacate the portions of the Commission's September 28, 1990 and January 17, 1991 orders requiring South Central Bell to begin operating under the regulatory reform plan and the technology master plan. We also remand the case to the Commission for the completion of the rulemaking proceedings involving the plans [6] and tax the costs of the appeal to the Commission.

TODD, P.J., concurs.

CANTRELL, J., files separate partial dissent.

CANTRELL, Judge, dissenting in part.

I respectfully dissent from Part III of the court's opinion holding that the Commission acted arbitrarily in deciding how South Central Bell should spend its excess earnings. I concur in the other parts of the opinion.

First, it seems to me that the court's discussion of the virtues of rulemaking versus adjudicatory proceedings dwells on a moot issue. The Commission has belatedly decided that a decision on whether to implement the technology master plan and the regulatory reform plan ' should come through rulemaking proceedings. So, that question is not before us.

The heart of the matter, though, is the part of the Commission's January 17, 1991 order allowing South Central Bell to spend a portion of its excess earnings on service improvements that happen to coincide with the first part of the master plan. The court's opinion frowns on that result, calling it an attempt to implement the master plan and the regulatory reform plan through adjudication.

I do not agree with that characterization. The master plan is a separate issue. It is still under consideration by the Commission, it affects all telephone companies operating in the state, and it may or may not be adopted. But, parts of the master plan may still be good policy for South Central Bell regardless of whether the plan ultimately gets adopted. That is a question for the Commission to decide. Since we agree, as stated in Part II of the majority opinion, that the Commission has the authority to allow excess earnings to be spent in extending or improving the company's service, I think the decision on the specific improvements to be funded is a matter

**6.** Since we have held that the Commission has the authority to adopt the policies embodied in the regulatory reform plan and the technology master plan, this opinion should not be construed as prohibiting the Commission from issu-

ing substantially similar orders once it has properly promulgated the plans as rules and has conducted the statutorily required rate-making proceedings.

addressing itself to the Commission's discretion and expertise.

Having arrived at this conclusion, I would go forward and hold that the Commission's decision is supported by substantial and material evidence in the record.

## OPINION ON PETITIONS FOR REHEARING

KOCH, Judge.

Both parties have filed Tenn.R.App.P. 39 petitions for rehearing with regard to our July 2, 1992 opinion. The TCTA requests (1) clarification of our opinion concerning the substantive validity of the regulatory reform plan and the technology master plan, (2) further consideration of the procedural validity of the Commission's pending rulemaking proceedings involving these plans, and (3) a determination whether the commissioners should be disqualified from future proceedings involving these plans. For its part, the Commission seeks clarification concerning the application of the opinion to the order in which the plans are adopted.

We have prepared this opinion to clarify two matters. First, we do not conceive that it is our role to conduct a substantive review of the wisdom of any rule or regulation. Second, we believe that it is inappropriate for appellate courts to render advisory opinions concerning proceedings and issues not properly before them.

### I.

We turn first to the questions raised by TCTA concerning whether the Commission's pending rulemaking proceedings comply with the Uniform Administrative Procedures Act and the other applicable statutes and whether the commissioners should be disqualified from these or any other related proceedings. We express no opinion on these issues since these proceedings are not before us.

The Tenn.R.App.P. 12 petitions for review define the limits of our jurisdiction in this case. As we read them, they challenge the Commission's July 31, 1990 order adopting the regulatory reform plan and the technology master plan and the Commission's September 28, 1990 and January 17, 1991 orders involving South Central Bell's excess earnings. They raise no issue concerning the validity of the rulemaking proceedings the Commission commenced on November 30, 1990.

█ Appellate courts will not render advisory opinions, *Banks v. Jenkins*, 224 Tenn. 23, 35, 449 S.W.2d 712, 717 (1969), and will not decide theoretical issues based on contingencies that may or may not arise. *United States Fidelity & Guaranty Co. v. Askew*, 183 Tenn. 209, 212, 191 S.W.2d 533, 534 (1946); *American Nat'l Bank & Trust Co. v. Mander*, 36 Tenn.App. 220, 234, 253 S.W.2d 994, 1000 (1952). Our earlier opinion dealt only with the Commission's efforts prior to November 30, 1990, to adopt the regulatory reform plan and the technology master plan and with the Commission's decisions concerning South Central Bell's excess earnings. We did not deal at all with the pending rulemaking proceedings because no issue had been raised concerning them and because they had not yet been completed.

After we remand this case, we anticipate that the Commission will first complete its rulemaking proceedings and will then proceed with rate-making proceedings[1] for South Central Bell, United Inter–Mountain Telephone Company, and any other telephone company electing to accept the terms and requirements of the regulatory reform plan and the technology master plan. In any of these proceedings, the parties or the intervenors have a right to challenge any substantive or procedural irregularity by raising the issue with the Commission.

It follows, therefore, that the TCTA may still raise issues before the Commission concerning whether the rulemaking proceedings are consistent with all the applicable statutory requirements. The TCTA

---

**1.** We consider "excess earnings investigations" to be within the scope of rate-making proceedings.

also remains free to request that the commissioners disqualify themselves from the rulemaking proceedings because of bias or prejudice. We have held only that the disqualification standards for rulemaking proceedings differ from those for adjudicative proceedings and that the present record does not contain sufficient evidence to warrant disqualification from the rulemaking proceedings. If the TCTA wishes to pursue the bias issue, it has the burden of presenting clear and convincing evidence that the commissioners have unalterably closed minds on matters critical to the disposition of the proceeding.

## II.

We also recognized in our earlier opinion that the Commission has broad power to set the regulatory policy for the utilities under its jurisdiction, *Patterson v. City of Chattanooga*, 192 Tenn. 267, 277–78, 241 S.W.2d 291, 295 (1951), and that the courts must be reluctant to second-guess the Commission's exercise of its regulatory judgment and discretion. We also recognized that the manner in which the courts review the Commission's actions depends on whether the actions are taken in the context of a rulemaking or adjudicative proceeding.

The courts have jurisdiction to review procedural issues no matter whether the Commission is engaged in rulemaking or adjudication. Like any other administrative agency, the Commission must comply with the statutes and constitutional provisions governing its procedures. Thus, we may review one of the Commission's rules to determine whether the Commission has the authority to promulgate it and whether the Commission complied with all applicable statutory requirements in doing so.

The Constitution of Tennessee provides clear demarcation of the boundaries of the three branches of government and directs each branch not to usurp the prerogatives of the others. Tenn. Const. art. 2, §§ 1 & 2. Mindful of the judiciary's role, the Tennessee Supreme Court has stated repeatedly that the courts should leave the formulation of policy to those with a constitutional mandate. *Smith v. Gore*, 728 S.W.2d 738, 746 (Tenn.1987); *Hyde v. Hyde*, 562 S.W.2d 194, 196 (Tenn.1978).

Rulemaking is essentially a legislative act. It is one of the ways that this State's public policy is formed. It follows, therefore, that an agency's decision concerning how the public's interest can best be served is entitled to substantial deference. *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 596, 101 S.Ct. 1266, 1275, 67 L.Ed.2d 521 (1981). Courts will not substitute their judgment for an agency's expertise, *FCC v. Schreiber*, 381 U.S. 279, 290–91, 85 S.Ct. 1459, 1468, 14 L.Ed.2d 383 (1965); *Amax, Inc. v. Colorado Water Quality Control Commission*, 790 P.2d 879, 883 (Colo.App.1989); *Department of Human Servs. v. Berry*, 297 Ark. 607, 764 S.W.2d 437, 438 (1989), and accordingly will not inquire into the wisdom of a rule or determine whether a rule embodies good or bad policy. *Vermont Ass'n of Realtors, Inc. v. State*, 156 Vt. 525, 593 A.2d 462, 466 (1991); *Omega Nat'l Ins. Co. v. Marquardt*, 115 Wash.2d 416, 799 P.2d 235, 241 (1990).

Agencies may not, however, promulgate rules that are so lacking in reason that they are patently arbitrary, unreasonable, or capricious. *Griffin v. State*, 595 S.W.2d 96, 99 (Tenn.Crim.App. 1980); *see also Benton v. Board of Supervisors of Napa County*, 226 Cal.App.3d 1467, 277 Cal.Rptr. 481, 488 (1991); *Granite City Div. of Nat'l Steel Co. v. Pollution Control Bd.*, 221 Ill.App.3d 68, 163 Ill.Dec. 549, 555, 581 N.E.2d 703, 709 (1991); *Alevras v. Delanoy*, 245 N.J.Super. 32, 583 A.2d 778, 779–80 (App.Div.1990). The scope of review under the "arbitrary and capricious" standard is narrow. The United States Supreme Court has pointed out that

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

In the absence of some constitutional infirmity, our review of an agency's rulemaking must stop if we find that the agency has the authority to promulgate the particular rule, that the agency has promulgated the rule properly, and that the rule itself is not arbitrary and capricious. As we pointed out in our earlier opinion, we will not weigh the evidence presented in favor of or in opposition to a rule since Tenn.Code Ann. § 4–5–322(h) (1991) does not apply to rulemaking proceedings. Thus, we will not disturb a rule even though the evidence may be in dispute and alternatives other than the rule may be available. *Griffin v. State,* 595 S.W.2d at 99.

Our earlier opinion should not be construed as indicating that we either approve or disapprove the substance of the regulatory reform plan or the technology master plan or whether the commission should adopt the plans at all. We have done neither. We have, however, determined that the commission has the statutory authority to promulgate rules dealing with the subject matter of these plans, that the substance of these plans is not contrary to any of the Commissions' other statutory authority, and that the plans themselves are not arbitrary or capricious.

We have also determined that if the plans are to be adopted, they must be promulgated as rules in accordance with the Uniform Administrative Procedures Act and the other statutes governing the commission's rulemaking power. Whether the Commission ultimately elects to promulgate either or both plans and the substance of the plans are the Commission's prerogative, not the courts'.

### III.

The Commission also expresses concern that our earlier opinion requires the adoption of both plans and stands for the proposition that the existence and validity of one plan depends on the existence and validity of the other. We agree that a clarification of our holding is in order.

If the Commission decides to adopt either of these plans, it must promulgate them as rules. The substance of the plans and the timing of their adoption are within the Commission's discretion. However, the Commission cannot base its decision in any related rate-making proceeding on either of the plans until they have been promulgated as rules. Accordingly, the Commission could theoretically promulgate the technology master plan without promulgating the regulatory reform plan. However, if it did so, it cannot pattern its decision in later implementing the technology master plan proceedings after any element of the regulatory reform plan.

TODD, P.J., and CANTRELL, J., concur.

